## THE TEXAS MARU.

(Circuit Court of Appeals, Second Circuit. July 20, 1926.)

No. 302.

**1. Carriers ⟷159(1).**

Bill of lading, requiring claims to be made "on taking delivery," held not intended to conclude consignees without opportunity to examine.

**2. Shipping ⟷142—Notice of claim for damage to cargo of sugar held too late under bill of lading requirement.**

Notice of claim for damage to cargo of sugar from coal dust, given more than a week after discharge of cargo on pier designated by consignee, held too late, under bill of lading requiring claims to be made "on taking delivery."

**3. Carriers ⟷159(3).**

Carrier's rejection of claim on particular ground, other than failure to give timely notice, is not waiver of that defense, unless it affects consignee's compliance with such requirement.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by Arthur H. Lamborn and others, as copartners, etc., against the steamship Texas Maru, her engines, etc.; the Kokusai Kisen Kabushiki Kaisha, claimant. From a decree dismissing the libel, libelants appeal. Affirmed.

Appeal from a decree in admiralty dismissing a libel in rem against a Japanese ship for damage to a cargo of sugar.

The Japanese steamer Texas Maru, in September, 1920, at Samarang, Java, lifted a parcel of sugar, consisting of 63,396 bags, consigned to Baltimore and New York. Of these, 48,371 were covered by a bill of lading signed by the master on September 4th, and consigned "to order, notify Messrs. Lamborn & Co., New York," the libelants. This document contained 22 conditions and exceptions, of which the fifteenth read as follows:

"15. Any claim for loss, short delivery, or damage, and all other claims whatsoever, must be preferred in writing at the place of delivery to the company's agent, on taking delivery of the goods; otherwise the company shall not be liable."

The ship reached Baltimore on November 28th, where she began to discharge. Those bags stowed in the lower 'tween decks and hold of hatch No. 3 were found on examination to have been impregnated with coal dust, the damage for which the libel was filed.

The supposed cause of this, which for the purposes of this discussion may be taken to

have been established, was cracks in a removable wooden bulkhead which formed the after end of stowage hold No. 3, and which served to separate it from a cross-bunker just forward of the engine room. The planks of which the wooden bulkhead was made had been ceiled at their edges with battens on the after side, some of which were found displaced upon examination after the discharge. The libelants' theory was that due diligence had not been used to make the ship seaworthy in this respect, and that the consequent drifting or seeping of coal dust between the edges of the planks so left bare had fouled the bags, penetrated their surface, and damaged the sugar within. In the following opinion it is assumed, without deciding, that the libelants had established these facts.

The ship discharged directly upon a pier of the Pennsylvania Railroad Company secured for the purpose by the libelants' agent at Baltimore, Harris, at which he directed the ship to dock. On November 29th, when breaking the hatches into the lower 'tween deck and hold No. 3, the coal dust was discovered to have entered, and the bags as they were loaded in the slings showed serious discoloration. One of the libelants' weighers, Clark, on December 1st or 2d, observing their condition, called Harris on the telephone and told him that they would not make marketable delivery. Harris told Clark to lay them aside, if the railroad would not take them without exception, and, after talking with his principals, tried unsuccessfully to get a surveyor. On Friday, December 3d, the ship's agent at Baltimore, Carlin, called Harris on the telephone and complained of his efforts to survey the ship without leave. They talked of the stains, and finally went together to the pier. On their arrival they boarded the ship and looked into hold No. 3, in which there remained only about 200 bags then being discharged. Later they went together upon the pier and examined the stained bags. Harris swore that he told Carlin that "the bags were unmerchantable and that we could not ship them as sugars"; Carlin, that he had said "that the coal dust did not amount to anything at all and that generally the cargo was in very fine condition."

The ship left the pier on December 3, 1920, bound for New York, to complete her discharge, leaving the stained bags on the pier, where they remained until January 6th or 7th. The clean bags were eventually separated and shipped gradually, while the stained bags remained. During the last half of the month the parties were in negotiation as to a joint survey of the sugar in the stained bags; the owner consented in that event to its sale without prejudice, and sent a representative to Baltimore with several experts. Eventually the negotiations fell through, but in January, after an initial refusal by Harris, the owner was allowed to take away a sample bag of sugar to examine, and did so.

On December 10th, a week after the ship had left the pier, the owner's agent at New York and Carlin at Baltimore received a written notice conforming to the requirements of the fifteenth article of the bill of lading quoted above. On the same day the owner's agent answered that they were waiting for information regarding the damage and would give the claim "fair consideration" after being fully advised. The libel was filed and the ship arrested on the 13th; the answer was filed on May 10, 1921, in which for the first time the owner raised the point that the libelants had not complied with article 15. The libelants assert that the negotiations and the delay were a "waiver" of the defense under the fifteenth clause.

Van Doren, Conklin & McNevin, Peyton Randolph Harris, Alfred C. B. McNevin, and Louis O. Van Doren, all of New York City (Edward S. Bentley, of Lawrence, N. Y., of counsel), for appellants.

Hunt, Hill & Betts, of New York City (George C. Sprague and Edna F. Rapallo, both of New York City, of counsel), for appellee.

Before ROGERS, HAND, and MACK, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1] The natural meaning of the clause, "on taking delivery," would be taking possession, and would only involve a conscious acceptance—some assumption of control or custody of the goods. But to construe the clause literally in that way might endanger its validity; that is, if it were applied without allowing the consignee some preliminary opportunity to examine. So long as such documents are not controlled by statute, we must treat them as genuine contracts, and their terms as seriously intended; in the case at bar this is easier, because the bill of lading is commendably free from verbiage. At any rate, the clause, though subject to the canon contra proferentem, is to be honestly construed to effect its purpose, and, when possible, so as to retain its prima facie validity. Therefore we think that it was not intended to conclude the consignee, who might find

himself in possession before he had any chance to examine the goods, but only in case he either took possession after that chance was given him, or did not disclaim possession or make his claim, as soon as he discovered, or had opportunity to discover, the damage.

We have often enough held valid a clause which concluded the consignee, if the claim were not made before removal from the pier. The San Guglielmo, 249 F. 588, 161 C. C. A. 514; The Gen. Geo. W. Goethals (C. C. A.) 298 F. 935; Anchor Line v. Jackson (C. C. A.) 9 F.(2d) 543; The Bencleuch (C. C. A.) 10 F.(2d) 49; Grace & Co. v. Panama R. Co. (C. C. A.) 12 F.(2d) 338. While such limitations must be reasonable (The Queen of the Pacific, 180 U. S. 49, 21 S. Ct. 278, 45 L. Ed. 419), there seems to us no substantial difference between making claim before removal and before accepting delivery. When the ship unlades upon her own pier, a consignee will not ordinarily accept delivery until he is ready to remove, and, if he chooses to leave the goods on the pier after acceptance, he does not need the intervening period for his reasonable protection. When the discharge is upon his own pier, as here, it may be that the consignee at once gets possession; that we regard as an irrelevant question. If construed to bar him at that moment, the clause would hardly be valid; it would require all consignees to put in a caveat before accepting any cargo whatever. But, construed so as to conclude the consignee only when he has had a reasonable opportunity, we see no greater objection to it than to the more usual form, which, so far as we know, has been universally upheld.

It may be argued that so to construe the clause is to import into it a meaning which the words will not bear, that the intent was clear absolutely to conclude the consignee, once he had accepted possession, and that, as no chance for examination was expressed, none may be implied. But it would be altogether out of accord with usual canons to give to language an interpretation which the parties presumably would not have accepted, and it is patent that an interpretation which would make the clause invalid the owner would have rejected, and the consignee could not have insisted upon. The "delivery" intended was almost certainly one which gave the consignee that privilege which reasonable men would have agreed that he should have. Therefore we think that the clause meant to conclude the consignee only after he had had his chance to make a claim, and that it is valid.

[2] So understood, it is plain that the notice which arrived only on December 10th was too late. We need not decide whether the discharge upon the pier hired by the libelants to receive the sugar, and made in the presence of weighers and samplers employed by them, put it into their possession, strictly speaking. It is enough that Harris, who on any view was dressed with full authority, saw the goods and accepted delivery, if he was either advised of the damage, or put upon adequate inquiry as to its existence. This we think the facts prove. The sugar lay for a week upon the pier, within the exclusive control of the libelants, except as the United States should retain it for the payment of customs, an irrelevant factor as between the parties. The ship had no lien, because the bill of lading acknowledged the prepayment of freight, an admission conclusive in the hands of the libelants, who were buyers c. i. f. Assuming, as we do, that Harris might still have rejected delivery of the sugar as it lay, his acquiescence in the possession so created for a week after the ship had left was all that was needed to bring the clause into operation.

It is argued that his talk with Carlin was such a rejection. If forced to a decision, we should on this issue sustain the finding of the District Judge, not only because he saw Harris, but because Carlin's recollection, founded upon a memorandum made within a fortnight, was presumptively better than Harris', who was examined more than four years after the event. Furthermore, Carlin's testimony reads to us as especially impartial— his principal apparently was unwilling to examine him—and the libelants' strictures upon it are not substantial. But it is not necessary to adopt Carlin's version of what was said at the time. On his own story it is patent that Harris had not the slightest intention of refusing delivery. All he claims to have said was that the bags were unmerchantable and could not be shipped as sugar. This might by a somewhat strained construction be argued to be the assertion of an oral claim for damage, though even that we think it will not bear; but by no possibility can it be twisted to mean that he declined delivery, even for the time being and until he might communicate with his principals. He let the ship leave for New York without suggestion that the sugar was not within his actual, as it plainly was in his apparent, control, and with her disappeared the owner's last vestige of authority to enter the pier except at his will. Indeed, this increases the probability that what Carlin said was true, and that Harris

thought nothing of the stains, but believed the ship had made right delivery.

That was apparently the libelants' belief for nearly a week afterwards, because it was not until the 9th that they even put themselves in train for a protest. So far as we can find, during that time no communications passed between the parties of any sort. Perhaps they were misled into supposing that the dust had not penetrated; but it is plain that they had not decided to make any claim, and, if they are to escape the effect of the contract, it must be because the appearance of the bags did not advise them of the probability that the dust had penetrated the bags. If Harris is to be believed, that question is answered. But we need not believe him. Clark, the weigher, thought the stains suspicious, and in any event they led to an investigation at once. The dust is represented as a substantial coating; the bags were presumably of the usual porous kind. That the appearance put the consignee on inquiry, and that that inquiry need not have taken a week, seems to us beyond argument.

The supposed estoppel, or "waiver," or whatever else it may be called, we have recently passed on in Grace & Co. v. Panama R. Co., 12 F.(2d) 338.

[3] It is quite true that there is authority for the position that a carrier may become bound by rejecting a claim on one ground and ignoring the failure to present it in season. Where the result of this or any other conduct of his has been to mislead the shipper into letting the time pass within which he might give the notice, there is good ground for the doctrine; but it seems to us to be inapplicable when the supposed "waiver" takes place after the time has expired. A man does not create obligations by even the most formal admission of their validity. Besides, the doctrine has generally been applied when the supposed obligor has rejected the claim on a specific ground other than the failure to give the notice. But on this we do not rely. The doctrine in this circuit is that, except as the obligor's conduct has in substance affected the obligee's compliance with the condition, no recognition of the obligation, express or implied, is of any consequence.

Decree affirmed.

ROGERS, Circuit Judge, through illness, was unable to take part in the decision of this case.