Leo Hess International Corporation, Respondent, *v.* Isthmian Steamship Company, Appellant.

Isthmian Steamship Company, Third-Party Plaintiff, *v.* Barkey Importing Company, Inc., Third-Party Defendant.

Barkey Importing Company, Inc., Counterclaimant, *v.* Leo Hess International Corporation, Plaintiff and Defendant to Counterclaim, and M. Shafi Iravani Mottaghi, Defendant to Counterclaim.

First Department, February 25, 1958.

*Walter P. Hickey* of counsel (*L. de Grove Potter* with him on the brief; *Kirlin, Campbell & Keating,* attorneys), for appellant.

*Ira M. Millstein* of counsel (*Marshall C. Berger* with him on the brief; *Weil, Gotshal & Manges,* attorneys), for respondent.

BREITEL, J. A steamship carrier moved for summary judgment dismissing the complaint of a holder of a bill of lading (who sues for nondelivery), on the ground that the time limitation in which to sue, provided both in the applicable statute and in the bill of lading, bars the action. Special Term denied the motion and the carrier has appealed. The order should be affirmed, there being issues of fact which require resolution before the availability of the defense may be determined.

The Carriage of Goods by Sea Act (U. S. Code, tit. 46, § 1303, subd. [6]) provides with respect to time limitations: "In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods, or the date when the goods should have been delivered".

Clause 18 of the bill of lading provides: "In any event, the carrier and ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered."

The issue in this case is the date from which the one-year limitation is to be measured. The shipment consisted of Iranian carpet wool transported from Iran to New York City. The vessel arrived here on February 4, 1951. Including the period

required to unload and the custom of allowing free time after discharge of cargo, the goods, it is undisputed, should have been delivered by March 1, 1951. This action was begun January 8, 1953. On these facts the carrier moved for summary judgment on the ground that the action is time-barred, not having been brought within one year from the date when the goods ought to have been delivered.

However, because of certain intervening events, which will be described, 102 bales of Iranian carpet wool, corresponding in quantity to the number of bales covered by the bill of lading involved in suit, were delivered by the carrier and received by plaintiff in June, 1952. Hence, plaintiff argues that the time limitation is to be measured one year from the June, 1952 delivery, rather than from March 1, 1951.

Plaintiff, Hess, holder of the bill of lading purchased it from the shipper, Iravani, in January, 1952, when the goods had already, supposedly, been in port almost one year. Hess requested an inspection but failed to obtain one until after the expiration of the year from the date when the goods should have been delivered. When the goods were finally inspected it appeared that 98 of the 102 bales did not bear the shipping marks identifying the goods as those carried under the bill of lading. Only four of the bales bore such marks. Moreover, Hess claims the goods were damaged and, to a substantial extent, of lower quality than that described in the bill of lading. Nevertheless, the carrier and Hess negotiated, with the result that in June, 1952 Hess took the 102 bales and surrendered the bill of lading. Both parties reserved, however, any rights they had under the bill of lading. This understanding was reduced to writing and, since it is crucial to the issues in this case, its full text is set forth:

" Whereas the above described Bill of Lading No. 19 covers 102 bales of Iranian Carpet Wool marked B.I.C. Nos. 5067–5084/5–5094/7–5099/5120–10172/77–10180/83–10222/236–11092/97–11100/101–11134/136–11138/154–14174/76–14240/242–14264/66–14268/278, and whereas, there are now 102 bales of Carpet Wool in storage at Pouch Terminal, Staten Island, New York which bales were inspected by Superintendence Co. Inc. 2 Broadway, New York 4, New York at your request, and you state, based on their report that the numbers on the 102 bales in storage are not the same as the numbers set forth in the Bill of Lading with the exception of four bales.

"Isthmian Steamship Company, in consideration of your accepting delivery of the 102 bales in storage as above set forth hereby agrees to defend, and hold you harmless from any claim

made against you and legal actions started against you by other firms, persons or corporation claiming that they are the owners of and are entitled to delivery of the 102 bales or any part thereof, except any bales covered by Bill of Lading No. 19 in storage at Pouch Terminal as set forth in the report of inspection from Superintendence Co. Inc., 2 Broadway, New York 4, New York, to you dated June 2, 1952 and to be accepted by you as aforesaid.

"The acceptance of the 102 bales as above set forth and the giving of this undertaking by us is without prejudice to the rights and liabilities or claims of either of us under the terms and conditions of the Bill of Lading referred to above or otherwise."

Before considering further the effect of the June, 1952 delivery and the understanding under which it was made, the following facts are significant: Sometime after the goods had arrived in port the Barkey Importing Company, Inc. (which is a third-party defendant, not involved in this appeal, on a complaint over served by defendant carrier) made claim for a large quantity of Iranian carpet wool shipped from Iran. It presented bills of lading for all of the goods except for three shipments, one of which, covered by Bill 19, was composed of the 102 bales involved here. With respect to those shipments it represented that the bills of lading were lost, missing, or stolen, and, upon tendering a letter of indemnity to the carrier, was permitted to remove quantities of Iranian carpet wool, purportedly satisfying the three missing bills. The odd thing is, among a number of other odd and unexplained facts,[*] that of the 102 bales delivered in June, 1952 to Hess, there unquestionably are four bales identified as belonging to the bill of lading purchased by Hess from Iravani in January, 1952. These Barkey obviously did not receive in connection with its indemnity letter for the allegedly missing bill now turned up in the hands of Hess.

There is no question that where a carrier fails to deliver goods within one year after the goods should have been delivered, the statute and the limitation clause in the bill of lading discharges it of all liability in any action brought to recover for nondelivery. It would also appear, by analogy to the Interstate Commerce Act (U. S. Code, tit. 49, § 16, subd. [3]), covering domestic interstate shipments (an analogy previously drawn by the Court of Appeals [*M. & T. Trust Co.* v. *Export S. S.*

---

[*] For example, the shipping mark for bales under Bill 19 was "B.I.C.", evidently representing "Barkey Importing Company". But Barkey's relationship to the shipment is nowhere fully explained in this record.

*Corp.,* 262 N. Y. 92, 96–97]), that the statute and contract limitations are not tolled or revived by word or conduct of the parties, at least in the absence of fraud, even when reduced to formal stipulation executed prior to their expiration (cf. *Midstate Co.* v. *Pennsylvania R. R. Co.,* 320 U. S. 356). So too, on the facts here, there should be rejected Hess' arguments of waiver or estoppel based upon the carrier's delay in granting inspection, or in taking part in negotiations which looked to settlement of the dispute. (*Southern Pacific Co.* v. *Stewart,* 248 U. S. 446.)

But what has happened in this case is that a delivery was made after the time in which to sue for nondelivery had expired. The delivery that was made, insofar as the pleadings and affidavits are concerned, was made purportedly in discharge of the bill of lading, or this is at least a disputed issue of fact between the parties. Consequently, the unusual situation has arisen under this disjunctive limitation provision in that the limitation had expired with regard to one branch (after nondelivery) but had not expired with regard to the other branch (after delivery) when the action was brought.

Apparently, this situation is one of first impression. Cases involving nondelivery cited by the carrier (*M. & T. Trust Co.* v. *Export S. S. Corp.,* 262 N. Y. 92, *supra*; *Potter* v. *North German Lloyd,* 50 F. Supp. 173; see, also, *Bank Melli Iran* v. *Isthmian S. S. Co.,* 3 A D 2d 994, arising out of the same transactions involved in this action, namely, the other two " missing " bills of lading) are not applicable.

It is not surprising that there are no ready precedents. Normally, goods are delivered within a reasonable time after the ship docks, in which case the suit for damages to the goods, if such be the claim, must be brought within one year from the date of delivery; or else the goods are never delivered, in which event, the action for nondelivery must be commenced within one year of the time that they ought to have been delivered.

But the question here is whether the one-year limitation begins to run from the delivery date or the date the goods ought to have been delivered, *whichever shall occur first,* or whether the one-year limitation begins to run from the date of delivery when such delivery occurs some time after the goods should have been delivered under the nondelivery test. Thus, a logical extension of the carrier's argument is that, if in this case the carrier had delivered to Hess in the eleventh month after the goods should have been delivered, then Hess would have been limited to but one month in which to start a suit for damages to the goods, rather than having a full year. This construction

becomes even more absurd if the delivery is effected on the last day of the year in which the goods should have been delivered. Then Hess would have only a few hours to bring an action or be forever barred. This is a distorted construction that is neither admissible nor practical. Counsel point to no cases, no language in the statute, nor to any legislative history to sustain the view that once a delivery has been made the time limitation starts from the day when the goods ought to have been delivered, rather than on the date the goods actually were delivered.

While it is true that the carrier's position is that the non-delivery test should be the exclusive test where the whole period of limitation for nondelivery has expired, there is no logical basis for distinguishing this from the situation where the delivery is made just short of the expiration of that period.* If goods are delivered one day after the expiration of one year from the time when the goods ought to have been delivered, the holder of the bill of lading would have no right to sue. On the other hand, if the actual delivery is made one day before the expiration of the period he has one year, less one day, in which to sue. This makes no sense. Moreover, as a further consequence, on this view, the carrier approaching the end of the nondelivery year has it in its power by a further withholding to deprive the holder of the bill of lading of any claim for damages to the goods, even though the carrier delivers immediately after the expiration of the nondelivery year.

Inquiry is, nevertheless, necessary to determine whether the June, 1952 delivery really was made in discharge of the bill of lading. On the one hand, it may have been in every sense a purported delivery under the bill of lading made in response to Hess' demand, albeit with substituted goods claimed to be "fungible" or of equal value with the original goods. If it was, Hess had one year from that delivery in which to sue. If, on the other hand, the June, 1952 delivery was merely a

---

* Thus, the carrier relied on two cases (*Grace & Co.* v. *Panama R. R. Co.,* 12 F. 2d 338; *Texas Maru,* 13 F. 2d 538), not only on the question of waiver, which was injected into the case by Hess, but also for the proposition that once a time limitation has expired it may not be revived, even by the most explicit words or conduct. These cases are beside the point. Apart from the fact that they involve notice of claim rather than action commenced, in neither case was there involved a disjunctive limitation provision by contract or statute with performance tendered under one branch after time under the other branch had expired. In passing, it should also be observed that these cases are not of unquestioned authority. (See 13 C. J. S., Carriers, § 241, subd. c, pp. 494–495; see, also, *contra, Oelbermann* v. *Toyo Kisen Kabushiki Kaisha,* 3 F. 2d 5.)

new *quid pro quo* given in exchange for whatever claim — even if unenforcible — Hess had under its bill of lading, and that *quid pro quo* was given and received with the understanding that this delivery was not in accordance with the bill of lading, an entirely different situation is presented. Then, both parties having reserved their rights under the terms and conditions of the bill of lading, the carrier still stood on whatever rights it had under the limitation clauses and no right of action was revived or extended with respect to any of Hess' rights under the bill of lading.

It is appropriate now to consider whether the document of June, 1952, the affidavits, and the attached exhibits resolved the nature of the June, 1952 delivery beyond any factual dispute. The document, quoted above, states that the carrier agrees to hold Hess harmless in consideration of Hess' " accepting delivery of the 102 bales in storage ". The last paragraph states that the acceptance of the 102 bales and giving of the undertaking is without prejudice to the rights or liabilities of either party. This language is not determinative of whether the carrier was giving the 102 bales to Hess in purported performance of its obligations under the bill of lading or whether it, was working out some sort of gratuitous substituted performance in discharge of an obligation, otherwise not enforcible by reason of time limitations. In its affidavit Hess asserted that the 102 bales were to be delivered, reserving the right of Hess to claim damages " for the substitution, if it could prove that there had been substitution ". It is asserted further that the carrier claimed to be delivering the 102 bales covered by the bill of lading, and that it was Hess' rights that were being reserved primarily. The carrier's answer set up an affirmative defense that the delivery was in consonance with the bill of lading. These assertions present an issue of fact as to what the parties intended in their negotiations prior to June, 1952, and what was the intended purport of the June, 1952, delivery. As Special Term clearly saw, revealed by its memorandum decision on reargument, there are questions of fact present which cannot be resolved on a motion for summary judgment.

Another dependent issue is presented. Hess' complaint in form seeks damages based on nondelivery. Special Term evidently viewed the matter as one requiring a pleading for damage to goods delivered, but did not insist on an amended pleading for the purposes of disposing of the motion for summary judgment. To that extent, this was correct (Shientag on Summary Judgment, pp. 63–64, and authority cited). Normally, the better practice is for the court to direct an amended plead-

ing where it is clear that, although the motion should be defeated because of facts developed in the affidavits, the pleading itself is insufficient (Shientag on Summary Judgment, pp. 72–73). However, in this case it is not so clear what should be the proper pleading. Where one effects a purported delivery, composed in part of the original, but damaged, goods, and the remainder in substituted, but also allegedly inferior and damaged, goods, it may well be a tenuous distinction to say that the proper action is for damages to the goods rather than for their nondelivery. On any view, it is rather difficult to categorize substituted inferior goods under either head. The point is that on either verbalization the performance tendered was less than that bargained for, and in this case there is no doubt as to what is meant. This is no assurance to Hess that it may rest on its present complaint. Perhaps, indeed, it would be wise for it to plead causes of action on both theories, utilizing the liberality authorized by section 258 of the Civil Practice Act. Hence, Special Term's exercise of discretion was well taken in omitting a positive direction, at that stage of the proceedings, to plaintiff to serve an amended pleading.

Accordingly, the order of Special Term denying defendant's motion for summary judgment should be affirmed, on the law, with costs and disbursements of this appeal to respondent.

BOTEIN, P. J., FRANK, VALENTE and McNALLY, JJ., concur.

Orders unanimously affirmed, with $20 costs and disbursements to the respondent.