**WESTERN GEAR CORPORATION,**
Appellant,

v.

**STATES MARINE LINES, INC.,**
Appellee.

**No. 20430.**

United States Court of Appeals
Ninth Circuit.

June 13, 1966.

M. Bayard Crutcher of Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for appellant.

Donald S. Voorhees, of Riddell, Williams, Voorhees, Ivie & Bullitt, Seattle, Wash., for appellee.

Before HAMLEY AND JERTBERG, Circuit Judges, and THOMPSON, District Judge.

THOMPSON, District Judge:

This is an appeal from a summary judgment granted to States Marine Lines, Inc. upon the ground that the cause of action was barred by the applicable statute of limitations found in the Carriage of Goods by Sea Act [46 U.S.C.A. § 1303(6)].[1] We affirm.

Appellant, Western Gear Corporation, manufactured certain Barcs (Barge, Amphibious Re-Supply Craft) for the United States Army. A Barc is a large four-wheeled, two-propellered cross between a truck and a lighter, 61 feet long, 26 feet wide, weighing 90 tons. On March 10, 1963, Barc No. 26 was shipped at Seattle, Washington, by Western Gear Corporation aboard Marine Lines ship SS P & T Navigator consigned to Appellant at New Orleans, Louisiana, under bill of lading 206–1395, which recited the scheduled date of arrival at New Orleans as March 25, 1963. On March 11, 1963, Barc 26 was washed overboard off the Washington Coast. The Coast Guard recovered the Barc and returned it to Western Gear Corporation. The extensive damages were repaired and on August 6, 1963, Barc 26 was again loaded at Seattle, this time aboard Marine Lines ship SS Copper State, destined for New Orleans under bill of lading 206–2943. It was delivered at New Orleans on August 23, 1963. Western Gear Corporation's libel for damages resulting from the occurrences on March 11, 1963 was filed on August 13, 1964, within one year of the actual delivery of Barc 26 at New Orleans on August 23, 1963, but more than

---

1. "Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

"Said notice of loss or damage may be endorsed upon the receipt for the goods given by the person taking delivery thereof.

"The notice in writing need not be given if the state of the goods has at the time of their receipt been the subject of joint survey or inspection.

"In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered: Provided, That if a notice of loss or damage, either apparent or concealed, is not given as provided for in this section, that fact shall not affect or prejudice the right of the shipper to bring suit within one year after the delivery of the goods or the date when the goods should have been delivered.

"In the case of any actual or apprehended loss or damage the carrier and receiver shall give all reasonable facilities to each other for inspecting and tallying the goods."

sixteen months after the date (March 25, 1963) it should have been delivered aboard the SS P & T Navigator.

The undisputed facts, established by affidavits, show no connection between the original shipment of Barc No. 26 via SS P & T Navigator and its ultimate successful delivery via SS Copper State.[2]

It is Western Gear Corporation's contention that the words of 46 U.S.C. § 1303(6) should be read literally, that is, that "unless suit is brought within one year after delivery of the goods" means exactly what it says. If the goods were delivered at any time by any means, the limitation for commencement of suit runs from the date of such delivery. Respondent's interpretation is that the statute necessarily implies reference to the contract of carriage (bill of lading) upon which the suit is grounded and that it is only a delivery in performance of the obligations of that contract or a failure of delivery under that contract which fixes the date from which time runs, that is, either the date of delivery or the date "when the goods should have been delivered", as the case may be.

Inasmuch as libelant's claim for relief in this type of case sounds in contract and is based upon alleged violations of duties imposed by the contract of carriage, we deem Respondent's interpretation the more reasonable.[3]

The only frame of reference within which a determination can possibly be made of "the date when the goods should have been delivered" [Section 1303(6)] is by turning to the bill of lading. Further, the statute itself defines "carrier" as it is used in § 1303(6) as (46 U.S.C. § 1301): "The term 'carrier' includes the owner or the charterer who enters into a *contract of carriage* with a shipper." (Emphasis supplied).

Neither party has found case authority on facts similar to these. Appellee cites a number of cases showing that the statute of limitations in the Carriage of Goods by Sea Act has been strictly applied by the Courts to bar untimely suits. United States v. The South Star, 210 F. 2d 44 (2nd Cir., 1954) ; Singer Hosiery Mills of New York v. Cunard White Star, 199 Misc. 389, 102 N.Y.S.2d 762 (1951) ;

2. T. W. Plessner, Northwest Manager of Marine Lines, Inc., averred:

"2. That after the loss overboard of the Barc No. 26 from the SS P&T NAVIGATOR on March 10, 1963, the said Barc was recovered by the United States Coast Guard and was returned to libelant.

"3. That thereafter Army Barcs Nos. 26, 27, 28 and 29 were shipped by libelant upon respondent's vessel, the SS COPPER STATE, under Bill of Lading No. 206–2943. The said Barcs were loaded onboard the SS COPPER STATE on or about August 6, 1963, and were scheduled to arrive in the Port of New Orleans, Louisiana on or about August 23, 1963.

"4. That carriage of Barc No. 26 by the SS COPPER STATE under Bill of Lading 206–2943 was an entirely separate and distinct transaction from the carriage of that Barc by the SS P&T NAVIGATOR under Bill of Lading 206–1395. That full freight was charged and was paid for the carriage of the said Barc by the SS COPPER STATE."

3. During the hearing on the motion for summary judgment, the following colloquy occurred between libelant's attorney and the Court:

"THE COURT : Of course, as I understand this, this claim is based upon the contract incorporated into the bill of lading, is it not, or is there anything else that is involved?

"MR. CRUTCHER : Well, that is correct, Your Honor. That is a cargo damage case in which the action is brought against the carrier under a bill of lading. Now I have submitted for Your Honor, and mainly to refresh your Honor's recollection, a very short chronology, Number 1, the fact that repairs were going on between the time that the bark was lost overboard and the time it was shipped the second time is not clearly brought out in the pleadings or the prior affidavit, and I have filed a supplemental affidavit simply to show that repairs—

"THE COURT : Is there a second bill of lading?

"MR. CRUTCHER : Yes, Your Honor. That is not the contract under which we are suing. But the bark was subsequently shipped to the original destination by the SS COPPER STATE. By coincidence it is also operated by STATES MARINE. But that is not otherwise relevant to what I would hope to talk to Your Honor about."

M. V. M., Inc. v. St. Paul Fire & Marine Insurance Co., 156 F.Supp. 879 (D.C. N.Y.1957); Meredith v. The Ionian Trader, 279 F.2d 471 (2nd Cir., 1960); J. Aron & Co. v. The Askvin, 267 F.2d 276 (2nd Cir., 1959).

We also have been referred to Leo Hess International Corp. v. Isthmian Steamship Co. (1958) 5 A.D.2d 250, 170 N.Y.S. 2d 705, where the Appellate Division of the New York Supreme Court, in a well-reasoned decision, decided that summary judgment should be denied on a defense that the action was barred under 46 U.S.C. § 1303(6). There a shipment of bales of Iranian carpet wool should have been delivered on March 1, 1951. There was an actual delivery of the 102 bales by the carrier to the holder of the bill of lading in June, 1952, the reasons for the long delay being unimportant to the issue of whether the claim was time-barred. The Court concluded that the issue of fact which precluded summary judgment was whether or not the June, 1952 delivery and acceptance of the goods was made in discharge of the bill of lading.[4]

This rationale seems to us to be entirely correct. Whenever there is an actual delivery of the goods in performance by the carrier of its obligations under the contract of carriage, the time to sue runs from the date of delivery rather than from the date when the goods should have been delivered. The difficulty with the instant case is that the undisputed evidence shows that the delivery of Barc No. 26 on August 23, 1963 was not in performance of the obligations of the contract of carriage (Bill of Lading 206–1395) upon which suit was brought. On the contrary, it was finally delivered un-der an entirely separate contract of carriage, to wit, Bill of Lading 206–2943. This is not to imply that the presence of two bills of lading would necessarily be conclusive in every case, but here Marine Lines has affirmed, without dispute, that the two shipments, first on the SS P & T Navigator and next on the SS Copper State, were entirely separate and distinct transactions (Fn. 3, supra).

The summary judgment is affirmed.

4. The Court said:
"Inquiry is, nevertheless, necessary to determine whether the June 1952 delivery really was made in discharge of the bill of lading. On the one hand, it may have been in every sense a purported delivery under the bill of lading made in response to Hess' demand, albeit with substituted goods claimed to be 'fungible' or of equal value with the original goods. If it was, Hess had one year from that de-livery in which to sue. If, on the other hand, the June 1952 delivery was merely a new quid pro quo given in exchange for whatever claim—even if unenforceable—Hess had under its bill of lading, and that quid pro quo was given and received with the understanding that this delivery was not in accordance with the bill of lading, an entirely different situation is presented."