**MINEX, a Polish Corporation, Plaintiff,**

v.

**INTERNATIONAL TRADING COMPANY OF VIRGINIA, a Virginia Corporation, Defendant and Third-Party Plaintiff,**

v.

**SS EIRINI, ex SS Aegina, her engines, etc., in rem, Augusta Shipping Corporation and N. J. Goulandris, Ltd., owner and agent respectively of the SS Aegina, in personam, and Islamorada Compania Naviera, S.A., a Panamanian corporation, in personam, Third-Party Defendants.**

**Civ. A. No. 5725.**

United States District Court
E. D. Virginia,
Norfolk Division.

Aug. 11, 1969.

Leonard B. Sachs, H. Lee Kanter, Norfolk, Va., for plaintiff.

Allan Zaleski, Norfolk, Va., for IT-COV.

Braden Vandeventer, Norfolk, Va., for EIRINI and others.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This case stands on a motion for summary judgment filed by Minex against International Trading Company of Virginia (ITCOV) as to the principal claim, and a like motion filed by the third-party defendants against ITCOV on the indemnity claim asserted by ITCOV. For reasons stated herein, both motions must be sustained.[1]

Minex caused its complaint against ITCOV to be filed on August 9, 1966. On November 26, 1966, ITCOV filed its third-party complaint against the vessel, the SS EIRINI, ex SS AEGINA, in rem, Augusta Shipping Corporation, a Liberian corporation, and the vessel's agent, N. J. Goulandris, Ltd., an English corporation, in personam. Subsequently, on July 24, 1967, ITCOV was granted leave to file an amended third-party complaint naming Islamorada Compania Naviera, S. A., a Panamanian corporation, as an additional *in personam* third-party defendant.

Minex, the Polish corporation, and ITCOV, the Virginia corporation, commenced doing business in 1956 or 1957 with Minex selling Polish cement to ITCOV, and the latter importing same into the United States. In 1961, Minex and ITCOV entered into an agreement entitled "Arrangement for 1961" setting forth the terms, conditions and quantities of sales by Minex to ITCOV for shipment of cement during that year. Since the agreement in question applied to all sales and shipments during 1961, it was unnecessary to execute separate contracts for each sale and shipment.

The established procedure was that ITCOV would direct its orders for cement to ITCOV's agents in Poland who, in turn, would notify Minex that a vessel had been chartered by ITCOV for the movement of cement, that the port of loading would be at a stated location, and that a certain quantity of cement was to be shipped. Upon receipt of these orders, Minex transported the cement in the quantity desired to the port in Poland designated by ITCOV or the shipowner's agent. The designated ports of discharge were of no interest to Minex because these details formed the basis of the charter between ITCOV, as trip charterer, and the shipowner's agent.

Various sales were made by Minex to ITCOV during 1961 and the first half of 1962, all pursuant to the document entitled "Arrangement for 1961."

Spencer, the president of ITCOV, admitted in answers to interrogatories that he ordered, by cablegram dated May 20, 1962, cement aggregating 227,907 bags, the equivalent of 9,458 tons, for an agreed consideration of $113,193.82. By cable dated May 18, 1962, ITCOV advised Minex that the former was in the process of chartering a vessel to transport said order to the United States. The chartering of the vessel was later confirmed by another cablegram to Minex with the AEGINA being designated as the chartered vessel. A series of cablegrams were thereafter exchanged between Minex and ITCOV in order to complete all necessary details. From these cablegrams and the "Arrangement for 1961," the cement was to be loaded aboard the AEGINA at the port of Gdansk, Poland. The trip charter, to which Minex was *not* a party, was under the provisions of a Uniform General Charter (GENCON) between Minex and Goulandris, the latter being the agents of the owners of the vessel, Augusta Shipping Corporation.[2]

Upon arrival of the cement at Gdansk, Poland, Minex employed and paid Polish stevedores to load and stow the cargo aboard the AEGINA, all in accordance with the "Arrangement for 1961" which

---

1. Various preliminary motions were filed by all parties, but the rulings thereon are not pertinent to the issues stated herein.

2. On May 7, 1959, Augusta Shipping Corporation had entered into a bareboat charter of the AEGINA with Islamorada Compania Naviera, S.A., for a period of 84 consecutive months. Goulandris acted as agent for Islamorada in trip chartering the vessel to ITCOV.

provided that the sale was "FOB stowed Polish port." Two bills of lading were issued for a total of 111,631 bags of cement, each being signed by the master of the vessel, and demonstrating on their face that the cargo was shipped "in apparent good order and condition." The bills of lading incorporated all of the "terms, conditions, liberties and exceptions of the Charter Party." Under paragraph 19 of the addendum to the charter, it is provided: "Vessel's holds to be thoroughly swept, cleaned and dried before commencement of loading * * *" The owner's responsibility clause, set forth in paragraph 2 of the charter, provides for liability "only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers or their stevedores or servants) or by personal want of due diligence on the part of the owners or their manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the owners or their manager." Paragraph 30 of the charter terminates the liability of the shipper as soon as the cargo is shipped.

As heretofore noted, Minex was not a party to the charter.

The bills of lading were attached to a bill of exchange in the form of a sight draft dated June 29, 1962, payable 45 days after sight to the order of Minex, drawn in the amount of the cement as shipped. ITCOV accepted the bill of exchange on July 30, 1962, by endorsing the face thereof.

Prior to ITCOV's acceptance of the bill of exchange, Minex had been notified by ITCOV that the initial discharge would be at the port of Fall River, Massachusetts. The AEGINA docked at said port and unloading commenced on or about July 16, with it being completed by July 31, 1962.

On November 2, 1962—more than three months after the completion of the unloading—a marine surveyor notified ITCOV that soybeans had in some

manner showered down from the deck beams onto the bags of cement during the course of the voyage, thereby contaminating the cement which was readily discernible when the cement bags were opened and dumped into bulk bins.

Prior to this discovery, ITCOV had apparently encountered some financial difficulties. Although ITCOV had accepted the draft and had taken possession of the shipping documents and cargo at Fall River, the draft was not paid. ITCOV ordered that the draft be dishonored in September 1962. Over a period of several months, continuing into January 1963, a number of cablegrams were exchanged between Minex and ITCOV, with ITCOV requesting and Minex granting extensions of time within which the draft could be honored. The draft was ultimately protested in proper form by Minex at a bank in Providence, Rhode Island, and subsequently the Manufacturer's Hanover Trust Company mailed the dishonored draft to the Polish bank in Warsaw but the bill of exchange was lost in transit.

Despite repeated demands by Minex for payment of the shipment, ITCOV has failed and refused to pay any amount on account, notwithstanding the fact that the cargo in question was delivered aboard the AEGINA "in apparent good order and condition" and that ITCOV accepted and used the cement for its own purposes. We are of the opinion that, upon these uncontroverted facts, Minex is entitled to summary judgment against ITCOV in the sum of $113,193.82, plus interest at 6% per annum from August 1, 1962—this interest being fixed in accordance with an exchange of cablegrams wherein the parties agreed that interest would be added after the acceptance of the cargo.

It is ITCOV's contention that Minex had a duty to make certain that the holds of the AEGINA were clean and fit for the reception of the cargo, and that Minex failed in this duty. Further, ITCOV says, the terms of the shipment "FOB stowed Polish port" are ambiguous, thus permitting parole evidence to determine

the true meaning of the contract. We disagree.

■ Under the agreement between ITCOV and Minex, it was ITCOV's responsibility to provide the vessel for the shipment of cargo. True, ITCOV could pass to Islamorada the responsibility for sweeping, cleaning and drying the holds by any charter party, but this in no way places that duty and responsibility upon Minex. Minex had the duty to load and stow, but not the duty to clean, sweep and dry the holds, deck beams, etc. ITCOV does not suggest that the cement shipment may have been contaminated *prior* to the loading by Minex. Indeed, assuming arguendo the contamination of the cement, it apparently occurred during the voyage to the United States.

■ We believe that the term "FOB stowed Polish port" is not subject to interpolation and, therefore, the affidavit of ITCOV's president is of no consequence. One of the leading authorities on the subject is Lawson v. Hobbs, 120 Va. 690, 91 S.E. 750 (1917). Applying the reasoning of that case, we conclude, as a matter of law, that the words "FOB stowed Polish port" mean that the cement was to be placed in the holds of the vessel for shipment without any expense or act on the part of ITCOV, and that when so placed (or stowed) the title passed to ITCOV with the resulting risk of ownership. See also: Geoghegan Sons & Co. v. Arbuckle Bros., 139 Va. 92, 123 S.E. 387, 36 A.L.R. 399 (1924); Fulton v. W. R. Grace & Co., 143 Va. 12, 129 S.E. 374 (1925). Cf. Aspegren & Co. v. Wallerstein Produce Co., 111 Va. 570, 69 S.E. 957 (1911), where the shipment was "F. O. B. New York" and the seller instructed the carrier to hold the goods until he could hear from his draft, the court held that the duty of the seller being not only to place the goods free on board cars, but also ready to go forward at once.

ITCOV does not contend that Minex made any reservation, after loading, that the cement could not go forward at once. Only if Minex had demanded payment prior to loading the cement aboard the AEGINA would the principles enunciated in *Aspegren* become applicable. Minex complied with every condition precedent required by the "Arrangement for 1961." [3]

ITCOV argues, however, that the addition of the word "stowed" to the shipping directive "FOB Polish Port" is tantamount to qualifying language on the interpretation of "FOB" and, taking the terms together, creates an ambiguity permitting evidence to vary the terms of the written instrument, thus precluding summary judgment. We disagree as applied to the facts of this case. The term "stowed" merely gives emphasis to the plaintiff's obligation under the contract. Clearly it would not have been sufficient to merely dump the bags of cement on an open deck. It required stowage under deck "in an orderly, compact manner," [4] and "in such a manner as to protect the goods from friction, bruising, or damage from leakage." [5] Once the cargo had been properly stowed, the risk of damage passed to ITCOV.

We turn to the motion for judgment filed by the third-party defendants directed to the claim of ITCOV. The latter takes the position that the action of the shipowner's agent in allegedly not providing a clean hold for the reception and shipment of the cement constituted a material derivation from the terms of the charter and, as a result of such deviation, the shipowner and charterer should be deprived of the protection of the one-year statute of limitation afforded by the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. section 1303.

The charter party is on a printed form and contains certain insertions, deletions

3. The Uniform Commercial Code, applicable in Virginia on and after January 1, 1966, recognizes the authority of Lawson v. Hobbs, *infra.*

4. Webster, Third New International Dictionary, p. 2253.

5. Black's Law Dictionary (4 Ed.), p. 1589.

and additional clauses, including the "U. S. A. clause Paramount which reads:

"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or any of its responsibilities or liabilities under said Act. If any term of the bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further."

COGSA provides, 46 U.S.C. section 1303, subsection (6), as follows:

"In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered * * *"

The action was not filed against the third-party defendants until November 26, 1966—more than four years following delivery.

On the subject of deviation, the bare wording of COGSA, 46 U.S.C. section 1304, subsection (4), implies that deviation should be restricted to controversies involving geographical matters. However, the authorities do not strictly confine the issue to geographical deviations. The more recent trend imports the notion of deviation into situations where no change of route is involved on the theory that various forms of misconduct on the part of the carrier or its agent are so serious as to amount to a material departure from the terms of the charter party, with the resulting consequence that the one-year limitation is disregarded. As to whether actual contamination of cargo constitutes a material deviation, we are unable to locate any authority although there are several references hereinafter made which tend to answer this question in the negative.

In Francosteel Corporation v. N. V. Nederlandsch Amerikaansche, etc., 249 Cal.App.2d 880, 57 Cal.Rptr. 867, cert. den. 389 U.S. 931, 88 S.Ct. 293, 19 L.Ed. 2d 282, the carrier issued bills of lading agreeing to carry specified steel products under deck. The steel was carried on deck, exposed to the elements, and was delivered in a badly rusted condition. Rejecting the argument as to deviation and upholding the carrier's contention that COGSA barred the action, the California court pointed out that "There is nothing which prevents the shipper from discovering his loss in time and pursuing his claim for damages. The development of worldwide communication obviates any requirement for waiting for reports from distant ports." So it is in the instant case. ITCOV discovered the contamination no later than November 2, 1962, well within the one-year period.

A shortage in the quantity delivered has been held not to be a deviation so as to bar the application of the limitation. Schwabach Coffee Co. v. S. S. SURINAME, 271 F.Supp. 960 (E.D.La., 1966).

It has been said that a stranding of the vessel, occasioned by negligent conduct, does not amount to a deviation. United States v. Wessel, Duval & Co., 115 F. Supp. 678 (S.D.N.Y., 1953).

Even where cargo is damaged in transit, returned to the point of shipment, repaired, and reshipped on a new bill of lading, it has been held that an action filed within one year from actual delivery, but sixteen months after it should have been delivered, is time-barred. Western Gear Corporation v. States Marine Lines, Inc., 362 F.2d 328 (9 Cir., 1966). And in American Oil Company v. Steamship Ionian Challenger, 366 F.2d 509 (2 Cir., 1966), the limitation period was applied not only to loss and damage to goods, but also to losses occasioned by delays in unloading where the carrier negligently cared for the cargo during the voyage, thereby causing lengthy delays in unloading at ports of discharge.

Stowage of goods on deck in violation of an express agreement has consistently been held to be a deviation and there is language in St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral, etc., 263

U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923), which, under some interpretation, could conceivably afford comfort to ITCOV. However, unlike the present case, *St. Johns* presented no charter party question and held that, in the absence of any custom or express contract in a form available as evidence, "a clean bill of lading imports under deck stowage." Moreover, *St. Johns* was decided prior to COGSA and, under the old rule, the deviating carrier was made an insurer. See also: Gilmore and Black, The Law of Admiralty, section 3–41, p. 161. We find that *St. Johns* is inapposite to the existing situation.

ITCOV relies upon Jones v. The Flying Clipper, 116 F.Supp. 386 (S.D.N.Y., 1953), where the shipment was damaged by reason of on-deck stowage contrary to the requirements of the bill of lading.[6] Without expressing any view as to the vitality of this authority, it is sufficient to state that there is a marked difference between the failure to provide a clean hold for the reception of cargo and the stowage of cargo on deck in utter disregard of the bill of lading. As stated by Circuit Judge Hutcheson in The Chester Valley, 110 F.2d 592 (5 Cir., 1940):

> "For, assuming as found, that there was negligent stowage of the cargo, this negligent stowage is not and could not constitute a deviation. For, deviation is such a serious departure from the contract of carriage as to amount to a different venture from that contemplated and therefore, an abrogation of the contract. Mere negligence with regard to the storage or handling of the cargo never constitutes a deviation. Such cases as deck stowage where the bill of lading imports under deck stowage, are not cases of merely negligent stowage, they are cases of stowage contrary to the contract."

*The Chester Valley* was cited with approval by Circuit Judge Augustus N. Hand in Petition of Isbrandtsen Company, 201 F.2d 281, 286 (2 Cir., 1953).

It seems clear that mere negligent stowage of cargo does not constitute a deviation. See also: Lagerloef Trading Co. v. United States, 43 F.2d 871 (S.D.N.Y., 1930).

We conclude, for reasons stated herein, that the motions for summary judgment filed by the third-party defendants directed to the third-party complaint of ITCOV must be sustained.

Counsel for Minex and the third-party defendants will collaborate for the purpose of preparing final judgment orders and, after presentation to counsel for ITCOV for inspection and endorsement, the same may be presented for entry.

---

6. This case has been criticized in Atlantic Mutual Ins. Co. v. Poseidon Schiffahrt, etc., 313 F.2d 872 (7 Cir., 1963).