## RUDY–PATRICK SEED CO. v. KOKUSAI KISEN KASUSHIKI KAISHA.

### No. 265.

Circuit Court of Appeals, Second Circuit.

July 13, 1936.

*Writ of certiorari denied 57 S. Ct. 46, 81 L. Ed. ——.

Crawford & Sprague, of New York City (George C. Sprague, of New York City, of counsel), for appellant.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and F. Herbert Prem, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal by the respondent from a decree in the libelant's favor upon a libel in personam in the admiralty for damages for breach of a contract of carriage. The contract was in the form of a bill of lading, covering the carriage of one hundred bags of grass seed from Kansas City to Königsberg, Germany; by rail to New York, thence by water to Hamburg by one of the respondent's steamers, the Ryufuku Maru. The question at issue concerns the final leg of the voyage, Hamburg to Königsberg, which the libelant alleges was to be wholly by water, and which the respondent says might be by rail or water, or both. The seed reached New York safely, was lifted by the Ryfuku Maru, and discharged at Hamburg; thence it went by rail to Lübeck, where it was shipped by water, bound for Königsberg; on this leg of the voyage it was lost. The libelant alleges that, having accepted it under a bill of lading calling for carriage to Königsberg by water, it was a deviation to ship it by rail to Lübeck which the subsequent water carriage, Lübeck to Königsberg, did not cure. The respondent alleges that the libelant authorized it to change the bill so that it might forward the goods by rail beyond Hamburg. The judge thought that the bill required all water carriage, and that the respondent had no authority to make the change which it did. He gave judgment for the libelant and the respondent appealed. The question is one of fact alone.

On July 1, 1930, the respondent, through its agent, the United States Navi-gation Company, whose western agents in turn were the Johnson-Phelps Company, made a general contract with the libelant to carry all shipments of bag seed at fixed rates from New York to Hamburg. On November 20th Briggs, the Kansas City agent of the Lehigh Valley Railroad, being so authorized by the libelant, asked the Johnson-Phelps Company to book for the libelant one hundred bags of grass seed "for Königsburg" (sic) "which we understand can be shipped via Hamburg at an arbitrary over the Hamburg contract rate." Johnson-Phelps Company in answer on November 21st executed and sent on by mail to the libelant a contract, booking space for one hundred bags on the Singapore Maru, sailing on December 9, 1930, "for Hamburg." On the 26th Stock, the libelant's traffic agent, who had received the contract of the 21st, filled out a domestic bill of lading on the libelant's printed form, which acknowledged the receipt of the goods at Kansas City to the order of the libelant, destined for Königsberg, by various railroads to New York, there to be delivered to the care of "U. S. Navigation Line steamer 'Singapore Maru,' sailing December 9th." Stock knew at this time that the goods would have to be transshipped at Hamburg, but he did not know that they would not go thence to Königsberg by water. This bill of lading was delivered up at Kansas City, and in its place one Lightner, the local agent of the initial carrier, the Rock Island Railroad, issued an export bill of lading on the 28th, on which this suit is brought. In this bill the destination as before was Königsberg, and the route was described as follows: "To be carried to the port (A) of New York, N. Y. and thence by U. S. Navigation Line to the port (B) Königsberg, Ger. (or so near thereto as vessel may safely get), and to be there delivered in like good order and condition as above consigned." The bill then continued with various limitations and conditions, divided into three parts: "Part I" affected only the rail carriage to "Port A" (New York), and may be neglected for the purposes of this case; "Part II" was from New York to "Port B" (Königsberg); "Part III" was from "Port B" to the place of destination, which being also Königsberg, added nothing and was a nullity, while the bill stood in that form. Lightner delivered copies of this bill to the libelant and sent some to New York. When the goods reached that place on December 3rd or thereabouts, the respondent saw that the

bill of lading read "Königsberg," instead of "Hamburg," and refused to accept the goods. Thereupon Clarken, a New York agent of the Lehigh Valley, the terminal rail carrier, telegraphed Atwood of the Rock Island who was Lightner's superior, and in whose name Lightner had signed the bill, asking him to take the matter up with Stock, which Lightner did in Atwood's place. Stock's version of the talk was that he had never authorized a change in "Port B" from Königsberg to Hamburg, that he had never intended to do so, but that he said "if there was any change it would be up to them * * * that I hold the through contract and bill of lading and that was all I cared about." Again, that the carriers might make any changes necessary to get the goods out, as long as they protected his rate and as long as the goods got on the ship; that he told Lightner to get hold of Briggs, the general agent of the Lehigh Valley in Kansas City, "and thresh it out and get that shipment moving." Lightner was more explicit in his story, but really there was no difference between them. He said that Stock told him to confer with Briggs and "straighten it out. Do the necessary, but that shipment must move on the steamship booked because if it dont it is liable to get there too late and be refused * * * You fellows fix it up, it is agreeable to me what you do, but you fix it up." Cooper for the Lehigh Valley also had a talk with Stock in which "he said it would be all right to make such changes as were necessary so long as we protected the through rate and protected the clearance of the shipment." Thereupon Lightner telegraphed to the Lehigh Valley in New York to change Port B to Hamburg, and the respondent accepted this authorization and so changed the bill. The Ryufuku Maru lifted the seed on December 9th and carried it to Hamburg, whence it went by rail to Lübeck, and thence by water bound for Königsberg, as we have already said.

The bill of lading in its original form could hardly have been other than a mistake. Stock knew that the respondent must transship at Hamburg; we cannot suppose that he deliberately made up a document which he knew to be beyond the respondent's obligations; to insert Königsberg as "Port B" could only be because he had not read the bill of lading, or did not understand it. Had the respondent accepted the seed under the same mistake, perhaps it would therefore have been relieved, for the mistake would have been mutual; but that we need not decide. It observed the error and refused to accept the goods until it had been corrected. No doubt in correcting it it assumed the risk that the libelant's consent had been actually obtained; but when Stock authorized Lightner and Cooper to make any change necessary which should not delay the shipment, that was enough. Being concerned only with protecting his rate and the proper expedition of the goods so that he should not lose his market, it made not the least difference to Stock whether they went by water from Hamburg to Königsberg, or by rail and water. There was no greater risk by one route than the other, and indeed it was on the water leg that the goods were in fact lost. As all the testimony was taken by deposition, we are in as good a position as the judge to decide this question of fact. We hold therefore that Stock gave Lightner authority to change "Port B" in the bill to Hamburg and that the contract was lawfully amended before the Ryufuku Maru lifted the seed.

The respondent would still be liable unless the bill of lading, as altered, did authorize rail carriage beyond Hamburg, but we think it did. There were three provisions regulating the final leg of the voyage (Part III), the first of which alone is in the least appropriate to the matter in hand: "In case the regular vessel service to final port of delivery should for any reason be suspended or interrupted, the ocean carrier, at the option of the owner or consignee of the goods, or holder of the bill of lading may forward the goods to the nearest available port, this to be considered a final delivery, or to store them at the port (B) second above mentioned at the risk and expense of the goods until regular service to the final port of destination be opened again." That did not prescribe water shipment; it merely provided for possible delays in case the goods did go forward by water, properly assuming that a similar excuse was not necessary if they went by rail. Considering the frame of the bill more generally, the contrast between the provisions regulating the three different "Parts" into which the voyage was divided leave no fair room for doubt. Part I was plainly intended for land carriage; it made no mention of vessels or of water carriage, nor did it contain any of those conditions common in

such contracts. Part II was as plainly intended for nothing else; it covered water carriage and that alone. Part III was not limited to either; it was applicable to both land and water carriage. The contrast is most significant. Moreover, the bill was the standard export bill of lading promulgated by the Interstate Commerce Commission, and intended for all shipments to foreign countries, not adjacent. It was certainly meant to cover inland destinations, and whither only rail carriage would often be possible. The claim is quite devoid of merit. The libelant would have been the first to complain, had its market been lost, because the goods had lain at Hamburg awaiting a vessel to Königsberg. So far as their language allows, contracts must be read as the parties would have wished, had the occasion been presented to them in advance; that is really what we mean by their intent. Before the bill was changed, since Part II was from New York to Königsberg, the language of this bill would not have allowed us to construe the meaning as the parties would even then have wished; but after the change there is no obstacle and their intent must prevail.

Decree reversed; libel dismissed.