[Civ. No. 23412. First Dist., Div. One. Mar. 31, 1967.]

FRANCOSTEEL CORPORATION, Plaintiff and Appellant, v. N. V. NEDERLANDSCH AMERIKAANSCHE, STOOMVART-MAATSCHAPPIJ, Defendant and Respondent.

Stephen McReavy, Ellis J. Adler and Hall, Henry, Oliver & McReavy for Plaintiff and Appellant.

R. Frederic Fisher, Lillick, Geary, Wheat, Adams & Charles and Lillick, McHose, Wheat, Adams & Charles for Defendant and Respondent.

SIMS, J.—Plaintiff has appealed from a judgment dismissing its complaint following the sustaining of a demurrer thereto, without leave to amend, on the grounds that the action is barred by the one-year limitation contained in subsection (6) of section 3 of the United States Carriage of Goods by Sea Act. (Act., Apr. 16, 1936, § 3(6), 49 Stat. 1208, § 3(6), 46 U.S.C.A., § 1303(6).)

The allegations of the complaint are essentially as follows: that defendant, a common carrier of goods by sea, issued

certain bills of lading wherein it agreed to carry steel products under deck from Antwerp to certain United States ports; that in wilful breach of these contracts, defendant carried the goods on deck unprotected and exposed to the elements, thus causing them to be in a badly rusted condition when delivered in March 1963 to plaintiff, the holder of the bills of lading; that by reason of defendant's breach of the contract plaintiff has suffered damages in the amount of $12,022.11; and that defendant's conduct constituted a deviation so as to make defendant an insurer of the goods and to deprive it of all defenses under the bills of lading and under the United States Carriage of Goods by Sea Act.

The complaint was filed on March 18, 1965, approximately two years after delivery of the damaged goods. The statutory provision upon which defendant relies reads: ''In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods. . . .''[1]

Plaintiff contends that the on-deck storage of the goods in violation of the agreement to carry them underdeck constitutes a deviation under maritime law; and that the effect of

---

[1] The full text of subsection (6) is as follows: ''Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be *prima facie* evidence of the delivery by the carrier of the goods as described in the bill of lading.

''If the loss or damage is not apparent, the notice must be given within three days of the delivery.

*''Said notice of loss or damage may be endorsed upon the receipt for the goods given by the person taking delivery thereof.*

''The notice in writing need not be given if the state of the goods has at the time of their receipt been the subject of joint survey or inspection.

''In any event, the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered:

*''Provided, That if a notice of loss or damage, either apparent or concealed, is not given as provided for in this section, that fact shall not affect or prejudice the right of the shipper to bring suit within one year after the delivery of the goods or the date when the goods should have been delivered.*

''In the case of any actual or apprehended loss or damage the carrier and the receiver shall give all reasonable facilities to each other for inspecting and tallying the goods.'' (Act, Apr. 16, 1936, § 3(6), 49 Stat. 1208, § 3(6), 46 U.S.C.A., § 1303(6), asterisks designate provisions not found in the Hague Rules, Article III, rule 6, as amended at the Brussels Convention of 1924, but added to the United States Carriage of Goods by Sea Act, which is hereinafter referred to as Cogsa.)

the deviation is to displace the provisions of the bill of lading and the statute, and to make the carrier liable as an insurer, subject to suit until such time as action may be barred by laches. It relies on the law governing restrictive provisions in bills of lading as established prior to the adoption of statutory controls, and asserts that the historical background, legislative history and express terms of the Carriage of Goods by Sea Act demonstrate that its provisions are not to be applied where there is an intentional breach of the contract of carriage, of the nature alleged here. It also asserts that it is inequitable and illogical to permit defendant to claim the benefit of the statutory provision to escape liability for an intentional wrong.

Defendant, in support of the applicability of the statute, derives comfort from two trial court decisions which seemingly support its position, and attempts to draw a favorable analogy from decisions construing other provisions of the act. It also appeals to the circumstances underlying the enactment of the statute, and the express provisions embodied therein; and insists that they demonstrate that reason, common sense and sound public policy necessitate application of the statutory limitations to the claim asserted by plaintiff.

So far as can be ascertained, the case is one of first impression insofar as a deviation or breach of the contract of carriage of the nature asserted by plaintiff is concerned. ██ Resort to the various criteria suggested by the parties leads to the conclusion that a policy of international uniformity dictates that the provisions of rule 6 of article III of the Hague Rules be applied to an action where the alleged deviation is on-deck storage under a clean bill of lading.

*Common Law Principles*

The common law liability of the maritime carrier has been summarized as follows:

"Where, then, a shipowner receives goods to be carried for reward, whether in a general ship with goods of other shippers, or in a chartered ship whose services are entirely at the disposal of the one freighter, it is implied in common law, in the absence of express contract—

"That he is to carry and deliver the goods in safety, answering for all loss or damage which may happen to them while they are in his hands as carrier:

"Unless that has been caused by some act of God, or of the King's enemies; or by some defect or infirmity of the goods

themselves, or their packages; or through a voluntary sacrifice for the general safety:

"And, that those exceptions are not to excuse him if he had not been reasonably careful to avoid or guard against the cause of loss, or damage; or *has met with it after a departure from the proper course of the voyage*; or, if the loss or damage has been due to some unfitness of the ship to receive the cargo, or to unseaworthiness which existed when she commenced her voyage." (Italics added.) (I Carver, Carriage by Sea (11th ed. 1963 [British Shipping Laws, Vol. 2]), par. 20, p. 20; and see Gilmore & Black, The Law of Admiralty (1957) § 3-22, pp. 119-120; and Knauth, Ocean Bills of Lading (1953) p. 116.)

Prior to statutory regulation, the shipowners were free to contract concerning their liability, and "the carriers developed the 'free' contract to a point where it could be said that the carrier accepted the goods to be carried when he liked, as he liked, and wherever he liked." (Knauth, *op. cit.*, p. 116; and see Carver, *op. cit.*, par. 100, pp. 87-88; and Gilmore & Black, *op. cit.*, § 3-23, pp. 120-122.)

In the absence of a specific statutory or a valid contractual limitation, courts in maritime cases apply a doctrine of laches. The rule governing the exercise of the court's discretion has been stated as follows: "It is the sound legal discretion of cultivated reason, in which the circumstances of the parties, of the property, and of the transaction, the wants and convenience of commerce, the demands of public policy, and, most especially, the analogies of the local laws of limitations are fully to be considered and carefully weighed." (Benedict's Admiralty (4th ed. 1910) § 514, p. 345; and see *Conty* v. *States Marine Lines, Inc.* (2d Cir. 1966) 355 F.2d 26, 27; and Gilmore & Black, *op. cit.*, § 9-79, p. 628.)

Deviation has been described as follows: "To deviate, lexicographically, means to stray, to wander. As applied in admiralty law, the term 'deviation' was originally and generally employed to express the wandering or straying of a vessel from the customary course of the voyage, but in the course of time it has come to mean any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased, such as carrying the cargo on the deck of the ship contrary to custom and without the consent of the shipper, delay in carrying the

goods, failure to deliver the goods at the port named in the bill of lading and carrying them farther to another port, or bringing them back to the port of original shipment and reshipping them. Such conduct has been held to be a departure from the course of agreed transit and to constitute a 'deviation' whereby the goods have been subjected to greater risks, and, when lost or damaged in consequence thereof, clauses of exceptions in bills of lading limiting liability cease to apply. [Citations.]'' (*G. W. Sheldon & Co.* v. *Hamburg etc. Packetfahrt-Actien-Gesellschaft* (3d Cir. 1928) 28 F.2d 249, 251; see also Tetley, Marine Cargo Claims (1965) pp. 204-211; I Carver, *op. cit.,* par. 19, p. 19; and II *id.* [British Shipping Laws, Vol. 3], pars. 705-742, pp. 593-618; Gilmore & Black, *op. cit.,* §§ 3-40/3-42, pp. 156-162; Poor, Charter Parties and Ocean Bills of Lading (4th ed. 1954) § 69, pp. 189-200; Kanuth, *op. cit.,* pp. 240-270.)

"By stowing the goods on deck the vessel broke her contract, exposed them to greater risk than had been agreed and thereby directly caused the loss. She accordingly became liable as for a deviation, cannot escape by reason of the relieving clauses inserted in the bill of lading for her benefit, [fn. omitted] and must account for the value at destination.'' (*St. Johns N.F. etc. Corp.* v. *S.A. Companhia Geral Commercial* (1923) 263 U.S. 119, 124-125 [68 L.Ed. 201. 44 S.Ct. 30]; and see *The Delaware* (1872) 81 U.S. 579, 598 and 604 [20 L.Ed. 779].)

In *St. Johns N.F. etc. Corp.* the issue was whether the shipper had assented to storage on deck. In resolving that issue against the carrier, the court held that provisions of the bill of lading, which purported to relieve the carrier of liability for loss or damage from causes beyond his control, and to limit the liability to $100 per package unless otherwise stated, were rendered inapplicable by the deviation.

The opinion of the Circuit Court of Appeals, which was affirmed, is informative in that it sets forth the reasons for the rule, as follows: "The cargo was laden on deck contrary to the requirements of the clean bill of lading issued therefor, and by reason thereof the bill of lading and all its clauses were wiped out, and the ship cannot claim the benefits of any limitations therein contained. [Citation.] To so stow the cargo was a deviation which changed the character of the voyage so essentially that the shipowner who has deviated cannot claim the benefits of the terms of the bill of lading. It vitiates and

avoids the contract of carriage. [Citations.] The same rule prevails in England. [Citation.] The reason therefor is that the exemption clauses and limitation in the bill of lading are for the benefit of the carrier who has control of the shipments after its delivery to him. By his bill of lading he declares the manner and place of carriage. The shipper having this notice, understands the reasons attendant upon the character of the transportation, and accepts the limitations and dangers. Freight rates are fixed accordingly. The shipper protects himself accordingly with insurance. When the carrier voluntarily varies from the method or place of carriage contracted for, he leaves the shipper with unknown risks against which he has not insured and he cannot recover on the insurance which he obtains. The shipowner is in the same position as in the case of deviation in route. [Citation.]'' *(The St. Johns N.F.* (2d Cir. 1922) 280 F. 553, 556-557; and see *The Sarnia* (2d Cir. 1921) 278 F. 459, 462-466, cert. den. 258 U.S. 625 [66 L.Ed. 797, 42 S.Ct. 382], in which the stowage on deck invalidated a stipulation as to the value of the shipment.)[2]

Other cases unequivocally declare the principle that deviation strips the ship of all excuses, and imposes upon her the liability of a common carrier, i.e., of an insurer. *(Farr* v. *Hain S.S. Co.* (2d Cir. 1941) 121 F.2d 940, 944; *The Pelotas* (5th Cir. 1933) 66 F.2d 75, 77; *Rudy Patrick Seed Co.* v. *Kokusai Kisen Kabushiki Kaisha* (S.D.N.Y. 1935) 12 F.Supp. 727, 731, revd. (2d Cir. 1936) 85 F.2d 17, on grounds the alleged deviation was authorized.)

In *United States* v. *Wessel, Duval & Co.* (S.D.N.Y. 1953) 115 F.Supp. 678, the provisions of the Carriage of Goods by Sea Act were incorporated in a charter party between the parties to which the statute itself would not apply. In considering the effect of the incorporation of the provisions contained in section 3(6), the court observed: ''The argument is that if the alleged breaches of duty on the part of Wessel Duval amounted to a deviation then Wessel Duval would be deprived of the protection of the one-year

---

[2]Gilmore & Black, The Law of Admiralty (1957) notes: ''The reason for the old rule seems to have been that the cargo lost its insurance when the vessel deviated, so that it was felt appropriate and just to put the vessel in the insurer's position. But at present cargo policies usually contain clauses which provide that, in the event of deviation, the risk shall be 'held covered,' notwithstanding. If and when the cargo owner learns of a deviation, it becomes his duty to notify the insurance company, and to pay an additional premium to be arranged.'' (§ 3-41, p. 161.)

limitation in section 3(6) of the Carriage of Goods by Sea Act. That provision reads: 'In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered.' Those words 'in any event' may well result in preserving this statutory limitation even though the ship has been guilty of a deviation. Here, however, the Act has effect only as an agreement of the parties; if the agreement that, unless suit is brought within one year, the ship shall be discharged goes by the board when the ship is guilty of a deviation, the agreement that unless suit is so brought the ship shall be discharged 'in any event' will go by the board too. The words 'in any event' have no greater sanctity than the rest of the clause.

"The authorities indicate and I hold that deviation does deprive the ship of the protection of a provision in the contract of carriage limiting the time for suit or claim. *Sidney Blumenthal & Co. Inc.* v. *United States,* D.C.S.D.N.Y., 21 F.2d 798, not reviewed by the appeal reported 2 Cir., 30 F.2d 247; *Rudy Patrick Seed Co.* v. *Kokusai Kisen Kabushiki Kaisha,* D.C.S.D.N.Y., 12 F.Supp. 727, reversed on other grounds 2 Cir., 85 F.2d 17; *General Electric Co.* v. *Argonaut S.S. Line,* D.C.E.D.N.Y., 7 F.Supp. 720; but see *Singer Hosiery Mills* v. *Cunard White Star, Ltd.,* 199 Misc. 389, [102 N.Y.S.2d 762]." (115 F.Supp. at p. 684.) The court found, however, that the alleged failure of the defendant to make the ship seaworthy, upon which the plaintiff relied, was not a deviation.

The cases cited in *Wessel, Duval & Co.* do support the principle that deviation abrogates contractual provisions which purport to limit the time within which an action may be commenced for loss or damage to the goods which were the subject of the contract of carriage. (See also *Kemsley, Millbourn & Co.* v. *United States* (2d Cir. 1927) 19 F.2d 441, 442.)

Before further examining the effect of on-deck stowage of cargo in violation of the terms of the contract of carriage upon contractual and statutory provisions limiting the carrier's obligations, note should be taken of qualifications to the broad statements contained in the foregoing cases involving deviation.

"Deviation originally meant (and still means in most juris-

dictions) an intentional change in the geographical route of the planned voyage.'' (Tetley, *op. cit.*, p. 19; and see Gilmore & Black, *op. cit.*, § 3-42, pp. 161-162; Knauth, *op. cit.*, p. 241.) The extension of the doctrine in the United States to include nondelivery, deck carriage, and overcarriage, and the failure to distinguish between an intentional and a negligent change in the geographical route of a planned voyage has been criticized. It is suggested that deviation under the Hague Rules is best considered as an intentional change in the geographical route of the planned voyage. (Tetley, *op. cit.*, pp. 17-24, *passim*; and see Gilmore & Black, *op. cit.*, § 3-42, p. 161.)

The harsh effects of the doctrine of deviation which ''substitutes one contract—an 'insurer's liability' contract implied by law in the cases—for another contract, that made by the parties under the Harter Act or Carriage of Goods by Sea Act and expressed in the bill of lading'' (Knauth, *op. cit.*, p. 242), also has been disparaged by some observers with a plea that it be strictly limited to where the deviation is unreasonable, intentional and contributes to the loss (*id.*, p. 243; and see Gilmore & Black, *op. cit.*, §§ 3-40/3-42, pp. 156-162, *passim*).

*Legislative History*

Dissatisfaction of American shipping interests with the exculpatory clauses in bills of lading used by the carriers led to the adoption of the Harter Act of 1893. (Act, Feb. 13, 1893, ch. 105; 27 Stat. 445; 46 U.S.C.A., §§ 190-196.) This act prohibits stipulations relieving the carrier from liability for negligence and for failure to exercise due diligence in making the vessel seaworthy, but in turn provides for limitation of liability for errors of navigation, dangers of the sea, acts of God, etc., if the owner had exercised due diligence to make the vessel seaworthy. (See I Carver, *op. cit.*, pars. 240-243, pp. 204-208; Gilmore & Black, *op. cit.*, §§ 3-23/3-24, pp. 120-124; Knauth, *op. cit.*, pp. 118-122.)

International recognition of these principles was ultimately effected at the International Convention for the Unification of Certain Rules of Law relating to Bills of Lading at Brussels, August 15, 1924, which modified and adopted the ''Hague Rules.'' (51 Stat. 233, U.S. Treaty Series No. 931.) In 1936 the United States incorporated the ''Hague Rules'' with some clarifying amendments as the Carriage of Goods by Sea Act, and in 1937 it ratified the Brussels Convention

subject to two understandings. (See Tetley, *op. cit.*, pp. 284-296 and 297-302; and Knauth, *op. cit.*, pp. 127-131.)

Acknowledgedly, Harter and Cogsa were designed to redress the inequality of bargaining power between carrier and shipper. Plaintiff contends that this intention, as openly asserted in the Senate when the latter act was presented and adopted, compels a construction favorable to the shipper, and precludes divesting him of rights he would enjoy in the absence of the statute unless it expressly takes them away. This approach overlooks the fact that both enactments are predicated upon compromising the demands of the carriers for exoneration, and the demands of the shippers for the imposition of even greater responsibility on the carriers. "Neither the Hague Rules nor the [Brussels] Act of 1924 lay down a complete code of law covering the carriage of goods under bills of lading. They simply replace a conventional contract by a legislative bargain. The general principles of English law are still applicable to the carriage of goods except as modified by the Act." (I Carver, *op. cit.*, par. 232 at p. 198; and see Gilmore & Black, *op. cit.*, § 3-24 at p. 123; and Knauth, *op. cit.*, pp. 128-129.)

One salient fact does stand out. The international complexion of the Hague Rules suggests that consideration be given to international uniformity in the construction of the act. "It is important to remember that the Act of 1924 was the outcome of an International Conference and that the rules in the Schedule have an international currency. As these rules must come under the consideration of foreign Courts it is desirable in the interests of uniformity that their interpretation should not be rigidly controlled by domestic precedents of antecedent date, but rather that the language of the rules should be construed on broad principles of general acceptation." (Lord Macmillan in *Stag Line, Ltd.* v. *Foscolo, Mango & Co.* (House of Lords, 1931) [1932] App.Cas. 328 at p. 350; and see Lord Atkin, *id.*, at pp. 342-343; *Robert C. Herd & Co.* v. *Krawill Machinery Corp.* (1959) 359 U.S. 297, 301 [3 L.Ed.2d 820, 79 S.Ct. 766]; Tetley, *op. cit.*, pp. 25-27 and 29; I Carver, *op. cit.*, pars. 231-232, pp. 196-197; and (1965) First Supplement; and Knauth, *op. cit.*, pp. 136-137.)

The core of Cogsa is found in sections 3 and 4. The former deals with the responsibilities and liabilities of carrier and ship. Subsection (1) defines the carrier's duty to provide a seaworthy ship, properly manned, equipped and supplied, and

fit and safe for the reception, carriage and preservation of the cargo. Subsection (2) defines the carrier's duty of care with respect to the goods themselves from loading to discharge. Subsections (3), (4), (5) and (7) deal with the issuance of and contents of the bill of lading, and the legal consequences flowing therefrom. Subsection (6) is the subject of this controversy (see fn. 1, *supra*). Subsection (8) renders null and void and of no effect any attempt to relieve or lessen the obligations imposed on the carrier by the act.

Section 4 provides for the rights and immunities of the carrier and ship. Subsection (1) grants immunity for loss or damage resulting from unseaworthiness, unless caused by want of due diligence of the carrier. Subsection (2) establishes 17 categories of uncontrollable causes of loss. Subsection (3) exonerates the shipper from responsibility for loss or damage sustained by the carrier or the ship where the shipper is free from negligence. Subsection (4) delimits the consequences of reasonable deviation.[3]

One commentator has observed: "The Act of 1936 applies the test of reasonableness to voyage clauses and deviations, as to other situations. Under the 1936 Act, it will always be a question whether any deviation is reasonable and hence excusable. The new Act therefore seems to have enlarged the rights of the carrier in this respect." (Knauth, *op. cit.*, p. 255.)

Subsection (5) provides for a limitation of $500 per package unless a higher value is declared by the shipper.[4] Subsection (6) defines the rights and obligations of the carrier and shipper in regard to inflammable, explosive or

---

[3]Subsection (4) provides: "Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this Act or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, *prima facie,* be regarded as unreasonable."* (Asterisks designate a proviso added to Hague Rules Article IV, rule 4 in the United States act.)

[4]Subsection (5) provides in part: "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with *the transportation of* goods in any amount exceeding *$500* per package *lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit,* or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be *prima facie* evidence, but shall not be [binding or] conclusive on the carrier." (Asterisks designate matter added or substituted, and brackets matter deleted in United States act.)

dangerous cargo when shipped either with or without the consent and knowledge of the carrier.

*Existing Precedents*

 Unless it is otherwise inapplicable, the one-year provision of section 3(6) will bar any action for loss or damage to goods which have been carried unless it is commenced within one year of the delivery. (See *Western Gear Corp.* v. *States Marine Lines, Inc.* (9th Cir. 1966) 362 F.2d 328, 330-331, and cases cited; *American Oil Co.* v. *Steamship Ionian Challenger* (2d Cir. 1966) 366 F.2d 509, 510; and *Hellyer* v. *Nippon Yesen Kaisya* (S.D.N.Y. 1955) 130 F.Supp. 209.)

The ''loss or damage'' referred to in the statute does not include, however, the right of a cargo owner to recover from the vessel or the carrier indemnity for salvage which he has paid. It is applied to instances involving damage directly to the cargo and to cases where there has been a delay in, or failure of, delivery or departure. (*States Steamship Co.* v. *American Smelting & Refining Co.* (9th Cir. 1964) 339 F.2d 66, 68-69, cert. den. 380 U.S. 964 [14 L.Ed.2d 155, 85 S.Ct. 1109].)

In *Potter* v. *North German Lloyd* (N.D.Cal. 1943) 50 F.Supp. 173 an action was brought on May 26, 1941 to recover the value of used household furniture shipped from Hamburg, Germany, in July 1939 and destined for Portland, Oregon, but never delivered because the vessel stopped and abandoned the voyage in Costa Rica upon the outbreak of the war in September 1939. The goods, which were there transferred to another ship for storage, were lost when the second ship was burned and scuttled some 18 months later. The defendant, among other defenses, relied upon the provisions of section 3(6) of Cogsa. The plaintiff claimed the delay constituted an unlawful deviation which nullified and rendered all bill of lading defenses unavailable to defendant.

The court acknowledged that the retention of the goods in Costa Rica for a period over 17 times the duration of the usual voyage originally intended, was ''a strong circumstance which, if not justified by the defendant's privileges under the bill of lading defenses on which defendant strongly relies, would make defendant's position most difficult with respect to plaintiff's contention that there was a deviation by reason of such long delay.'' (50 F.Supp. at p. 173.)

It concluded: ''If however the one-year time limit for bringing suit provided in the Carriage of Goods by Sea Act, 46

U.S.C.A. § 1303(6), applies to this case, the decision of it will be necessarily controlled by such statutory time limit with the result that plaintiff's action will be defeated whether the question as to deviation and its related questions are decided in plaintiff's favor or not.

"There can be no question but that the courts of this country, as required by 46 U.S.C.A. § 1300, have been applying to carriage contracts for ocean shipments in foreign trade to and from American ports the Carriage of Goods by Sea Act, *supra*, and Section 1303(6) thereof which in material part provides that: 'In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year *after* delivery of the goods or *the date when the goods should have been delivered. . . .*' (Italics supplied.) See *The Argentino*, D.C., 28 F.Supp. 440, 442 (Syl. 2) ; *The Zarembo*, D.C., 44 F.Supp. 915, 921 (Syl. 11, 12) ; *The Cypria*, D.C., 46 F.Supp. 816, 820 (Syl. 6, 7). Said section 1303(6) does apply to this case." (*Id.*, pp. 173-174.)

■ ■■■■ Upon finding that the goods "should have been delivered" more than a year before suit was filed, the court dismissed the suit.[5]

---

[5]Defendant asserts that because the matter is one involving concurrent jurisdiction of state and federal courts, and because it necessitates the interpretation of a federal statute, this court is bound to follow the decisional law of the *Potter* case, *supra*. (See *Urie* v. *Thompson* (1949) 337 U.S. 163, 174 [93 L.Ed. 1282, 69 S.Ct. 1018, 11 A.L.R.2d 252]; *In re Hallinan* (1954) 43 Cal.2d 243, 250 [272 P.2d 768]; *Showalter* v. *Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 471 [160 P.2d 895]; *Mackenzie* v. *Hare* (1913) 165 Cal. 776, 779 [134 P. 713, Ann.Cas. 1915B 261, L.R.A. 1916D 127], affd (1915) 239 U.S. 299 [60 L.Ed.2d 297, 36 S.Ct. 106]; *United Concrete Pipe Corp.* v. *Laborers' Local No. 89* (1964) 231 Cal. App.2d 315, 318 [41 Cal.Rptr. 816]; *B. C. Richter Contracting Co.* v. *Continental Cas. Co.* (1964) 230 Cal.App.2d 491, 497 [41 Cal.Rptr. 98]; *Monarch Wine Co.* v. *Butte* (1952) 113 Cal.App.2d 833, 834 and 837 [249 P.2d 291]; and *Crenshaw Bros.* v. *Southern Pac. Co.* (1919) 40 Cal.App. 603, 612 [181 P. 252].)

The doctrine of federal supremacy manifested by the foregoing cases in no way dictates that a state appellate court is bound to follow the precedent of a federal trial court. In fact the law of this state declares that under such circumstances "the decisions of the lower federal courts on federal questions are merely persuasive." (*Rohr Aircraft Corp.* v. *County of San Diego* (1959) 51 Cal.2d 759, 764 [336 P.2d 521], revd., without comment on this point, (1960) 362 U.S. 628 [4 L.Ed.2d 1002, 80 S.Ct. 1050]; and see *People* v. *Estrada* (1965) 234 Cal.App.2d 136, 145 [44 Cal.Rptr. 165, 11 A.L.R.3d 1307].) Nor are the federal courts, when directed to apply state law, bound by the legal precedent of a state trial court which does not have binding force on other courts within the state. (*King* v. *Order of United Commercial Travelers* (1948) 333 U.S. 153, 161-162 [92 L.Ed. 608, 68 S.Ct. 488].)

*Singer Hosiery Mills* v. *Cunard White Star, Ltd.* (1951) 199 Misc. 389 [102 N.Y.S.2d 762], involved overcarriage of goods which were shipped from Belfast to New York, but returned and then reshipped again to the destination. The action was commenced 17 months after the actual delivery of the goods in poor condition. The defendant's answer asserted both the provisions of section 3(6) of Cogsa and a clause in the bill of lading which incorporated similar provisions of the British Carriage of Goods by Sea Act of 1924.

The municipal court observed: "The manner in which the shipment was made was a substantial deviation from the contract of carriage as provided in the bill of lading and constituted an overcarriage. In my opinion, this deviation made the carrier an insurer. [Citations] . . . There is no question that under the maritime law and under New York State law, as quoted above, a substantial deviation by the carrier from performance as required by the bill of lading has serious effects upon the agreement between the parties. If the carrier breaches its contract, it should be estopped from claiming advantages which accrue to it solely by reason of the contract. The courts hold that such exceptions are invalidated." (199 Misc. at p. 391 [102 N.Y.S.2d at pp. 764-765].)

It concluded: "However, I feel that the entire contract is not nullified and those provisions remain which have not been affected by the breach which occurred. Be that as it may, the question of shipments by sea to or from ports of the United States is a matter of Federal regulation, more especially so when the shipment is governed by a bill of lading. The Carriage of Goods by Sea Act (U.S. Code, tit. 46, § 1300 et seq.) regulates the rights and obligations of the carrier and the shipper in the instances and in the particulars provided for in the act. Subdivision (6) of section 1303 provides: [quoting the provisions relied on by defendant herein].

"This provision of the Act is all inclusive; it is of the substance of the rights between the parties. Granting that a breach has occurred and even assuming that the provisions of the bill of lading have been nullified and the carrier has become an insurer, under our Federal law which governs this action, the shipper, unless he has in some manner been relieved from the one-year limitation, is bound to begin the action for a breach within one year after delivery of the goods or when the goods should have been delivered.

"There are no facts set forth showing that the consignees were lulled into a sense of security, misled, imposed upon, deceived or had been subjected to any fraudulent practice which prevented them from instituting this action within one year after delivery of the machinery. The bill of lading expressly states that the carrier and the ship are discharged from liability unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered and there is no reason why the consignees should not be held to compliance with this provision of the bill of lading and the similar provison contained in the Carriage of Goods by Sea Act. (*Switzerland General Ins. Co. of Zurich* v. *Navigazione Libera Tirestina S.A.*, 2 Cir. 1937, 91 F.2d 960; *Potter* v. *North German Lloyd*, N.D.Cal. 1943, 50 F.Supp. 173; *Matter of Wheeler*, 191 Misc. 33, 35 [76 N.Y.S. 2d 159]; *Zonite Products Corp.* v. *Mediterranean Navigation Co.*, 183 Misc. 962 [54 N.Y.S.2d 603].)'' (*Id.*, pp. 391-392 [102 N.Y.S.2d at pp. 765-766].)

*Singer* was followed, for the principle that the provisions of section 3(6) are all inclusive, in a trial court decision in *Albert* v. *Isbrandtsen Co.* (1957) 7 Misc.2d 67 [160 N.Y.S.2d 772]. In that case the court held that the provisions of the act applied to bar an action for damages which ensued following the failure to deliver a bill of lading. The dock receipt which had been given incorporated by reference the provisions of a bill of lading which in turn made the provisions of Cogsa applicable. The court stated: "While defendant may have breached the contract in that it did not deliver the bill of lading, the entire contract is not nullified and the provisions not affected remain in force [citation]." (7 Misc.2d at p. 69 [160 N.Y.S.2d at p. 774]. An appeal was dismissed (1960) 12 App.Div.2d 581 [214 N.Y.S.2d 236].)

*Singer* has been recognized by the United States Court of Appeals for the Ninth Circuit as standing for the proposition "that the statute of limitations in the Carriage of Goods by Sea Act has been strictly applied by the Courts to bar untimely suits." (*Western Gear Corp.* v. *States Marine Lines, Inc.*, *supra*, 362 F.2d 328 at p. 330; and see *States Steamship Co.* v. *American Smelting & Refining Co.*, *supra*, 339 F.2d 66, 69.)

The United States District Court for the Southern District of New York has not been so charitable. In *United States* v. *Wessel, Duval & Co.*, *supra*, 115 F.Supp. 678, as set forth

above, it is suggested that *Singer* is a mutation of the general rule that a deviation deprives the carrier of a contract provision limiting the time for suit. (115 F.Supp. at p. 684.) In *Jones* v. *The Flying Clipper* (S.D.N.Y. 1953) 116 F. Supp. 386, the court suggested that *Potter* and *Singer* each conflicted with dictum in *Switzerland General Ins. Co.* v. *Navigazione Liberia Triestina, S.A.* (2d Cir. 1937) 91 F.2d 960, 963, which indicated that a deviation would deprive the carrier of the benefit of the time limitation clause. (116 F.Supp. at p. 390.) Finally, in *Hellyer* v. *Nippon Yesen Kaisya, supra,* 130 F.Supp. 209, the two cases are referred to as standing for the proposition that ''the failure to deliver the subject matter of the contract has been held not to constitute such a fundamental breach as to vitiate the contract between the parties.'' (130 F.Supp. 211; and see Tetley, *op. cit.,* pp. 199, fn. 6, and 200, fn. 10.)

The foregoing authorities raise a doubt as to whether *Potter* and *Singer* stand for the proposition that the limitations period of section 3(6) applies despite any deviation, or merely establish that a failure to deliver, or an overcarriage is not such a breach of the contract (or deviation) as to render the contract a nullity and to take the case out of the operation of the statute.

Plaintiff also asserts that even though the bill of lading is not displaced when the breach (or deviation) is unintentional and involuntary (see *The Malcolm Baxter, Jr.* (1928) 277 U.S. 323, 332-333 [72 L.Ed. 901, 48 S.Ct. 516]), the carrier cannot escape liability by the clauses in the contract or statute when the breach is intentional. (*St. Johns N.F. etc. Corp.* v. *Companhia Geral Commercial, supra,* 263 U.S. 119, 124.)

It was observed above that on-deck stowage under a clean bill of lading is not universally considered a deviation, and it has been suggested that deviation, which would create rights apart from the provisions of the Hague Rules or of bills of lading based thereon, be limited to geographical deviation which is more generally recognized. Nevertheless, it has been postulated that whether on-deck stowage in violation of the contract of carriage be termed ''deviation'' or not, the carrier should not have the benefit of article III, rule 6 under such circumstances.

''The carrier contracts to carry cargo under deck and a clean bill of lading is an undertaking to that effect. It is

submitted that unauthorized carriage on deck is a breach sufficient to annul the contract.

"Thus, if goods are carried on deck and no statement to that effect appears on the face of the bill of lading, then the bill of lading contract is null, or can be annulled, because the whole nature of the contract has been vitiated. As a result the Rules do not apply, there being no contract of carriage. The carrier, therefore, does not have the benefit of the Rules, including the per package limitation or the one year delay for suit." (Tetley, *op. cit.*, p. 19.)

Other commentators suggest a contrary conclusion insofar as the time within which suit may be brought is concerned. "A goods-owner will *lose* any remedy he has against the carrier unless he issues a writ against him within one year, . . ." (I Carver, *op. cit.*, par. 274, p. 233; italics added.) "Can any event stop the running of the one-year limit? The Convention and Act are silent as to suspension of the running of the one-year limit upon the right to sue. No suspension of the time is granted. The time limit being statutory, it is absolute in the terms of the statute." (Knauth, *op. cit.*, p. 276 and see pp. 275-277.)

"It has sometimes been questioned whether this time limitation is applicable in cases of deviation. The decisions hold that it is, and this is sustainable on two grounds: (1) a statute is not displaced by a deviation, (2) the paragraph commences with the words 'in any event,' indicating that the statutory bar applies no matter what has happened. [Citing *Potter* and *Singer*].

"The language of the statute that 'the carrier and the ship shall be discharged from all liability' unless suit is seasonably brought indicates that the liability is extinguished, and that the carrier's defence is not merely one of procedure.

"Under our admiralty practice, suit may be commenced by the filing of a libel without service of process. Consequently, it is only in a very rare case that this provision could cause any injustice." (Poor on Charter Parties (4th ed. 1954) *supra,* § 64, pp. 160-161.)

Defendant turns to the express language of the statute and urges that the words "in any event" signify that the one-year clause is to be applicable "under any circumstances and in all situations." In *United States* v. *Wessel, Duval & Co., supra,* the court in suggesting that deviation would deprive the carrier of a contractual limitation predicated on section

3(6) observed: "Those words 'in any event' may well result in preserving this statutory limitation even though the ship has been guilty of a deviation." (115 F.Supp. at p. 684; and see Poor, *op. cit., supra.*)

On the other hand, the plaintiff with equal logic examines the phrase "in any event" in its context (see fn. 1, *supra*) and concludes that it imports that the limitation shall be applied "irrespective of how or when or whether notice is given" as provided in the remaining provisions of the subsection itself. It contends that since the statute applies to "every contract of carriage of goods by sea" (section 2), and " 'contract of carriage' applies only to contracts of carriage covered by a bill of lading or any similar document of title" (section 1(b)), the statute cannot be applicable in the event the bill of lading is rendered a nullity because of deviation or breach (see Tetley, *op. cit.*, pp. 15-16).

Further pursuit of this approach leads to those authorities which have construed the provisions relating to the construction of the per package limitation contained in subsection (5) of section 4 (see fn. 4, *supra*).

## Analogous Precedents

The effect of deviation on the applicability of the provisions for limitation of liability contained in section 5 had been the subject of litigation with varying results.

In *Searoad Shipping Co.* v. *E. I. duPont de Nemours & Co.* (5th Cir. 1966) 361 F.2d 833 (cert. den. 385 U.S. 973 [17 L.Ed.2d 436, 87 S.Ct. 511], the court reviewed a judgment of the United States District Court for the Southern District of Florida which had allowed the shipper recovery of the total loss of its cargo on the basis that deck-loading the cargo covered by a clean underdeck bill of lading amounted to deviation which makes the vessel an insurer. The Court of Appeals found that neither notations on the bill of lading concerning stowage, nor alleged consent or custom justified a departure from the general rule that underdeck storage was signified by the bill of lading. It upheld the trial court's finding of deviation and noted that the loss—a trailer containing the cargo which had been stored on deck went overboard —was related to the deviation. The court concluded: "There being no legal justification for this on-deck stowage of cargo shipped pursuant to an under-deck clean bill of lading, this

stowage amounted to a deviation casting the shipowner for the loss which was directly and causally related to the deck stowage.'' (361 F.2d at p. 838.)

Recognition of other authorities referred to herein was expressed as follows: ''And although one highly respected authority raises a question whether under Cogsa the awesome insurer consequence should now be visited on the vessel for nongeographical deviations, [Footnote 7: Gilmore & Black, Admiralty § 3-40, at 156 (1957), considering especially the impact of § 4(4) and the exemptions afforded under § 4(2) of Cogsa, 46 U.S.C.A. § 1304 (2), (4).] and one Court of Appeals keeps a statutory, if not a contract, limitation alive, [Footnote 8: See *Atlantic Mut. Ins. Co.* v. *Poseidon Schiffahrt*, G.m.b.H., 7 Cir., 1963, 313 F.2d 872, 1963 AMC 665, affirming N.D. Ill., 1962, 206 F.Supp. 15, 1963 AMC 669A. Rejecting *Jones* v. *The Flying Clipper*, S.D.N.Y., 1953, 116 F.Supp. 386, 1954 AMC 259, the Seventh Circuit holds the $500 per package limitation applicable notwithstanding a deviation.] we have no doubt that the insurer liability continues after Cogsa [Footnote 9: Knauth leaves it in no uncertain terms. 'It has become well settled that stowage of cargo on deck, when contrary to contract or custom of underdeck storage, is such a fundamental breach of the contract of carriage as to displace the contract clauses which might benefit the carrier, and constitutes the carrier an insurer of the safe arrival of the goods at destination' Knauth, Ocean Bills of Lading 260 (1953).] to flow from on-deck deviation where the damage is causally related. [Footnote 10: Here, as in *The Flying Clipper*, note 8, *supra*, there is no doubt about the causal relation between the deviation and the damage. The M-V Sealane weathered the storm. Its underdeck cargo arrived safely. The reasonably heavy, but foreseeable, forces of nature did their damage because the cargo was deck loaded in a van trailer.] '' (361 F.2d at pp. 835, 836.)

No mention is made of an earlier opinion by another judge of the District Court for the same Southern District of Florida which held that liability was limited under section 4(5) ''even assuming an unreasonable deviation'' from on-deck storage. The judge concluded: ''In *Jones* v. *Flying Clipper* the District Court held that on deck storage without notation on the bill of lading was a material deviation which vitiated the limitation of liability. A contrary conclusion was reached in *Atlantic Mutual*. It appears to the Court that the

reasoning of *Atlantic Mutual* is more persuasive. The statute appears plain that liability is limited to $500.00 in all cases in which the bill of lading is silent as to the value of the cargo and this applies 'in any event' and to 'any loss or damage.' '' (*Nassau Glass Co.* v. *Noel Roberts, Ltd., and M/V Noel Roberts* (S.D.Fla. 1965) 249 F.Supp. 116, 117.)

In *Atlantic Mut. Ins. Co.* v. *Poseidon Schiffahrt* (7th Cir. 1963) 313 F.2d 872 (cert. den. 375 U.S. 819 [11 L.Ed.2d 53, 84 S.Ct. 56]), the deviation consisted of an overcarriage and a one and one-half year delay in delivery. It was found to be unreasonable within the provisions of section 4. The court acknowledged: ''As a result of the rescission of the contract of carriage arising out of the unreasonable deviation, the contract is treated as not having existed, and the liability of the carrier becomes that of an insurer. *S.S. Willdomino* v. *Citro Chemical Co.*, 272 U.S. 718 [71 L.Ed. 491, 47 S.Ct. 261] (1927).'' (313 F.2d at p. 874.)

The court upheld the action of the district court which nevertheless had limited the liability to $500 per package under the provisions of section 4(5). The opinion refers to *Jones* v. *The Flying Clipper, supra,* as follows: ''In *Jones,* the court reasoned that the doctrine of deviation was so firmly entrenched in maritime law that such a drastic change would have been expressed in clear and unmistakable language. The court found no such language in the Act. We respectfully disagree with this reasoning and adopt that of the district court in the instant case: 'There is no question about the fact that prior to the enactment of the Carriage of Goods by Sea Act, the doctrine of unjustifiable deviation was firmly entrenched in maritime law. This doctrine had developed to circumvent the efforts of carriers to avoid justifiable liability through insertion in shipping contracts and bills of lading of provisions for minimum limitation of liability. It is equally certain that Congress may not be found to have changed existing law without expressing this change in clear and unmistakable terms. But it appears to this Court that the language of the statute, if it constitutes a change of existing law, according to the rule applied to other statutes, is sufficiently clear and unmistakable. No amount of interpolation is required to evaluate the weight of the phrases ''in any event'' and ''any loss or damage'' upon the admonition that ''neither the carrier nor the ship shall in any event be or become liable for any loss or damage . . . unless. . . .'' '

"In addition to the reasons stated by the district court, our conclusion finds support in the fact that the package limitation immediately follows § 4(4) of the Act, 46 U.S.C.A. § 1304(4) in which Congress, as we have already stated, recognized the carrier's liability for unreasonable deviations. It is difficult for us to believe that Congress did not intend this limitation to apply to the section next preceding it." (313 F.2d at pp. 874-875.)

In *Jones* v. *The Flying Clipper, supra*, 116 F.Supp. 386, the deviation consisted of on-deck stowage under a clean bill of lading. The causal connection between the deviation and the sea water damage to eight cases of automobiles stowed on the deck was not in dispute. The district court judge rejected the contention that the Carriage of Goods by Sea Act changed the prior rule which imposed full liability in the event of a deviation.

He not only found no intent to change the existing law (116 F.Supp., pp. 388, 389)—as was noted in *Poseidon, supra* —but also referred back to the reason for the original rule which made the deviating carrier an insurer, because the shipper may not have insurance covering the unanticipated additional risk as persuasive *(id.,* p. 389; and see *The St. Johns N.F., supra,* 280 F. 553, 556-557). The opinion also notes the difference in culpability when negligence is involved, such as in making the vessel seaworthy or handling cargo, and when an intentional breach of the contract of carriage has occurred *(id.,* pp. 389-390).

The court's further fears that the carrier would violate his obligations with impunity if his liability were limited *(id.,* p. 390) do not bear up under scrutiny. First, there is no reason to believe that the carrier would gain by wilfully incurring even limited liability, and, secondly, if *Poseidon* were the rule the shipper would still be free to declare the true value, although perhaps at a higher rate of carriage.

More significantly for present purposes, the court noted *Potter* and *Singer, supra,* and stated: "I do not consider these determinative of the issue presented under § 1304(5) of the Act or controlling precedent, particularly so, since, as counsel point out, a time limitation clause raises other issues. Moreover, Judge Augustus N. Hand, writing for the Court of Appeals, in a reference to the one year provision contained in the English Carriage of Goods by Sea Act, 1924, which like the United States Act, 1936, was based upon the Brussels Convention—Hague Rules, stated: 'Nothing resembling a

deviation has been shown to deprive the carrier of the benefit of the limitation' [citing *Switzerland General Ins. Co.* v. *Navigazione Libera Triestina, S.A., supra,* 91 F.2d 960, 963]." (*Id.,* p. 390.)

Further reliance on the limitation of liability point is placed on: *Stag Line, Ltd.* v. *Foscolo, Mango & Co., Ltd., supra,* [1932] App.Cas. 328; Knauth, *op. cit.,* p. 241; and Robinson on Admiralty (1939) § 75, p. 533; *id.,* pp. 390-391; and see also *The Pelotas, supra,* 66 F.2d 75, 77.)

From the foregoing cases it appears that defendant's reliance on *Poseidon* resembles a sand castle in danger of engulfment from a rising tide of contrary opinion. (See criticism of the district court decision (N.D. Ill. 1962, 206 F.Supp. 15) which was affirmed in *Poseidon,* Note, 36 Temple L.Q. (1963) 222; and Note on *The Flying Clipper,* 102 U. Pa. L.Rev. (1954) 797.)

Jones and each of the above commentators recognize a distinction between the effect of a deviation on the operation of the limitation of liability in section 4(5) and the operation of the limitation on the time to sue in section 3(6). "While a deviation by on-deck carriage does materially increase the risk of damage to the cargo, no type of deviation affects the time within which the shipper will have to bring suit." (102 U. of Pa. L.Rev. at p. 800; see also, 36 Temple L.Q. at p. 224; and 116 F.Supp., *supra,* at p. 390.)

A similar distinction between cause and effect is found in the cases construing the Fire Statute.

Since 1851 there has been a federal law limiting liability for loss or damage from fire unless caused by the design or neglect of the owner (Act of March 3, 1851, ch. 43, § 1, 9 Stat. 635, R.S., § 4282, 46 U.S.C.A., § 182; and see 46 U.S.C.A., § 1304(2)(b)). In *A/S J. Ludwig Mowinckels Rederi* v. *Accinanto, Ltd.* (4th Cir. 1952) 199 F.2d 134, the opinion states: "Even though stowage on deck of cargo shipped under clean bills of lading constitutes a deviation, this does not deprive the carrier of his right to exoneration under the fire provision of the Carriage of Goods by Sea Act, just as it does not deprive the owner of the protection of the fire statute, unless it was a cause of the fire. See *The Ida,* 2 Cir., 75 F.2d 278, 279; *Globe & Rutgers Fire Ins. Co.* v. *United States,* 2 Cir., 105 F.2d 160, 166; *The Venice Maru,* D.C., 39 F.Supp. 349, 353; *The Margaret Lykes,* D.C., 57 F.Supp. 466, 470." (199 F.2d at p. 145; see, in addition to cases cited: *Haroco*

*Co.* v. *The Tai Shan* (S.D.N.Y. 1953) 111 F.Supp. 638, 645-647, affd. per curiam opinion (2d Cir. 1955) 218 F.2d 822; and cf. *The Elizabeth Dantzler* (E.D.Va. 1920) 263 F. 596-597 and *The Indrapura* (D.Ore. 1909) 171 F. 929, 938-939.)

It is concluded that although the authorities construing other provisions of law do not buttress defendant's case, they do not necessitate that it be jettisoned.

## Conclusion

No determinative precedents on the scope of the one-year limitation have been found in either the cases construing section 3(6) or those dealing with other provisions of the Hague Rules. Nor do historical precedent, legislative history, or the words of the act itself mandate a particular construction. All must be correlated to determine a proper result.

It may be assumed from the foregoing analysis that insofar as a deviation, or a breach of the contract which would at common law render the contractual provisions void, contributes to or causes a loss, the carrier cannot rely on provisions which permit it to escape liability for the damages resulting therefrom. It does not, however, necessarily follow that a provision which reasonably limits the time within which the shipper or consignee may pursue his remedies, is also invalid.

It is not correct to say that the act and the rules do not deal with deviation. Section 4(4) expressly makes deviation a subject to be considered (see fn. 3, *supra*). It is apparent that even if a deviation is alleged, the court, before deciding whether the provisions of the bill of lading and the act (or rules) are to be displaced, must determine whether the deviation was a permitted deviation for "saving or attempting to save life or property at sea" or a "reasonable deviation."

It is not unreasonable to construe the act (and the rules) as contemplating that such an issue, as well as any issues as to liability under the act, and the extent of the damages flowing therefrom, should be pursued within the one-year period. Such a construction promotes the uniformity which is an acknowledged purpose of the act and rules. This is particularly true in the case of overcarriage, or deck stowage, or any other breach of the contract of carriage which is not universally recognized as a deviation. It relieves the carrier from harsh results which have no causal connection with the breach itself. Even though it ultimately be proved to be an intentional violation of the contract of

carriage, the shipper cannot claim prejudice in having to bring suit within one year as provided by the act. There is nothing inherent in the violation of deck stowage which prevents the shipper from discovering his loss and pursuing his claim for damages. The development of worldwide instant communications obviates any requirement for years of waiting for reports on the ship or cargo unheard of between far distant ports.

In short, the manifest purpose to expedite the channels of commerce along uniform lines dictates the conclusion that a breach of a contract for underdeck stowage will not entitle the shipper or consignee to avoid the discharge from liability conferred on the carrier and ship by the provisions of subsection 6 of section 3 of the Carriage of Goods by Sea Act.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied April 28, 1967, and appellant's petition for a hearing by the Supreme Court was denied May 24, 1967.